# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-DP-00821-SCT

*JEROME PETE SMITH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/01/93 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | BARRY J. FISHER |
| | LEMAN GANDY |
| | LELAND H. JONES, III |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 12/10/1998 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/31/98 |

**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

¶1. Jerome Pete Smith[1], along with his older brother, Clyde Wendell Smith, was indicted by a Leflore County grand jury for the November 7, 1992, robbery-murder of Sidon Package Store owner, Johnny B. Smith[2]. Both Jerome and Clyde were found guilty of capital murder by a Leflore County jury and subsequently sentenced to death. It is from this judgment, entered on July 1, 1993, that Jerome[3] now appeals, asserting the following errors:

> **I. THE TRIAL COURT ERRED IN TELLING JURORS THAT JEROME SMITH WOULD BE ELIGIBLE FOR PAROLE IF SENTENCED TO LIFE IMPRISONMENT, IN RESPONSE TO A MID-DELIBERATIONS QUESTION FROM THE JURY, AND IN**

GIVING A JURY CHARGE AND ALLOWING CLOSING ARGUMENTS FROM THE PROSECUTOR AND CODEFENDANT WHICH HIGHLIGHTED JEROME'S PAROLE ELIGIBILITY AND MISLEADINGLY SUGGESTED HE MIGHT BE RELEASED IMMINENTLY IF NOT SENTENCED TO DIE.

II. ALTHOUGH HE FILED A PRETRIAL MOTION DEMANDING NOTICE OF AGGRAVATING CIRCUMSTANCES AND EVIDENCE, JEROME SMITH WAS NOT INFORMED, UNTIL THE BEGINNING OF THE PENALTY PHASE OF HIS TRIAL, THAT THE PROSECUTION WOULD BE RELYING ON THE PREVIOUS-VIOLENT FELONY AGGRAVATING FACTOR AND WOULD BE OFFERING PROOF OF TWO PRIOR AGGRAVATED ASSAULT CONVICTIONS.

A. THE DENIAL OF PRETRIAL NOTICE OF THE STATE'S INTENT TO INTRODUCE APPELLANT'S PRIOR AGGRAVATED ASSAULT CONVICTIONS VIOLATED MISSISSIPPI LAW.

B. THE DENIAL OF PRETRIAL NOTICE OF THE STATE'S INTENT TO INTRODUCE APPELLANT'S PRIOR AGGRAVATED ASSAULT CONVICTIONS VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

III. THE JURY'S DEATH-SENTENCING VERDICT WAS LEGALLY INADEQUATE BECAUSE THE JURORS FAILED TO FIND THAT JEROME SMITH HIMSELF KILLED, INTENDED TO KILL, ATTEMPTED TO KILL, OR CONTEMPLATED THAT LETHAL FORCE WOULD BE USED, AND BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT SUCH FINDINGS.

IV. THE CIRCUIT COURT'S INSTRUCTIONS TO THE JURY AT THE SENTENCING STAGE WERE FATALLY FLAWED.

A. THE LOWER COURT IMPROPERLY DEPRIVED JEROME OF HIS RIGHT TO FULL CONSIDERATION OF ALL STATUTORY MITIGATING FACTORS, WHEN IT CHARGED THE JURY ON THE MITIGATING CIRCUMSTANCE THAT CLYDE WAS A LESSER PARTICIPANT IN THE CRIME, BUT DID NOT GIVE THIS INSTRUCTION AS TO JEROME OR AN INSTRUCTION ON THE SUBSTANTIAL-DOMINATION MITIGATING FACTOR.

B. JUDGE EVANS ERRED IN REFUSING TO CHARGE THE JURY ON SPECIFIC NONSTATUTORY MITIGATING CIRCUMSTANCES.

C. BECAUSE ROBBERY WAS AN ELEMENT OF THE OFFENSE OF CAPITAL MURDER, ITS ADDITIONAL USE AS AN AGGRAVATING CIRCUMSTANCE WAS IMPERMISSIBLY DUPLICATIVE AND CONTRAVENED THE NARROWING REQUIREMENT OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

D. THE TRIAL JUDGE'S INSTRUCTIONS IMPROPERLY LED JURORS TO BELIEVE DEATH WAS THE APPROPRIATE SENTENCE IF AGGRAVATING AND

MITIGATING CIRCUMSTANCES WERE IN EQUIPOISE.

V. THE PROSECUTOR ENGAGED IN MISCONDUCT BY MAKING NUMEROUS IMPROPER COMMENTS DURING HIS CLOSING ARGUMENT AT THE SENTENCING STAGE.

VI. THE DEATH PENALTY IS A DISPROPORTIONATE PUNISHMENT IN LIGHT OF THE GRAVE UNCERTAINTY AS TO WHETHER JEROME SMITH ACTUALLY KILLED THE VICTIM AND OTHER DISTINGUISHING FEATURES OF THIS CASE.

VII. THE TRIAL COURT ERRED IN PERMITTING JEROME SMITH TO VETO HIS ATTORNEYS' SEVERANCE MOTION, WHICH THE COURT HAD ALREADY GRANTED, AND ORDERING THAT HE BE TRIED JOINTLY WITH HIS CODEFENDANT ALTHOUGH SUCH A JOINT TRIAL WAS SEVERELY DAMAGING TO JEROME'S DEFENSE.

A. JEROME WAS ENTITLED TO BE TRIED SEPARATELY FROM HIS CODEFENDANT UNDER MISSISSIPPI AND FEDERAL LAW.

B. THE CIRCUIT COURT ERRED IN RESCINDING ITS SEVERANCE ORDER AND PERMITTING JEROME SMITH TO OVERRIDE HIS ATTORNEYS' DECISION TO OBTAIN A SEVERANCE, BECAUSE THIS DETERMINATION WAS ONE THAT TRIAL COUNSEL, AND NOT THE CLIENT, WAS AUTHORIZED TO MAKE.

VIII. JEROME SMITH'S FUNDAMENTAL RIGHT TO BE PRESENT AT ALL PROCEEDINGS IN THIS DEATH PENALTY CASE WAS VIOLATED WHEN THE VOIR DIRE AND DISMISSAL OF CERTAIN JURORS, A PROCEEDING INVOLVING THE COURT'S RESPONSE TO A MID-DELIBERATIONS QUESTION FROM THE JURY, AND A PRETRIAL HEARING AT WHICH HIS ORIGINAL ATTORNEY WAS REMOVED FROM THE CASE, ALL WERE CONDUCTED IN HIS ABSENCE.

IX. THE TRIAL COURT SHOULD HAVE EXCLUDED AS EVIDENCE ITEMS DISCOVERED BY LAW ENFORCEMENT OFFICIALS IN A WARRANTLESS SEARCH OF APPELLANTS' CAR, WHICH WAS NOT SUPPORTED BY PROBABLE CAUSE.

X. THE ASSISTANT DISTRICT ATTORNEY OFFERED IRRELEVANT, INFLAMMATORY, AND INADMISSIBLE OTHER-CRIMES EVIDENCE CONCERNING APPELLANTS' POSSESSION OF A SAWED-OFF SHOTGUN, THEIR COMMISSION OF AN UNSPECIFIED SEXUAL OFFENSE, AND THEIR USE OF ILLEGAL NARCOTICS.

XI. THE CIRCUIT JUDGE IMPROPERLY ADMITTED A SLEW OF HEARSAY STATEMENTS BY VARIOUS WITNESSES, INCLUDING A CRUCIAL STATEMENT BY THE CODEFENDANT CLYDE SMITH, WHICH IMPLICATED JEROME IN THIS OFFENSE AND AGGRAVATED THE CRIME.

XII. THE TRIAL COURT'S GUILT-STAGE INSTRUCTIONS WERE TAINTED BY

SEVERAL FUNDAMENTAL FLAWS.

A. JUDGE EVANS' INSTRUCTION ON THE ROBBERY PRONG OF CAPITAL MURDER FAILED TO INFORM JURORS OF THE NECESSARY CAUSE-AND-EFFECT CONNECTION BETWEEN THE "PUTTING IN FEAR" AND THE "TAKING" ELEMENTS OF THIS OFFENSE.

B. JUDGE EVANS' CHARGE ON THE ELEMENTS OF CAPITAL MURDER IMPROPERLY AMENDED THE INDICTMENT BY OMITTING THE ELEMENT OF "MALICE AFORETHOUGHT".

C. THE COURT'S INVITATION TO THE JURORS TO FIND JEROME GUILTY OF CAPITAL MURDER ON THE BASIS OF ANY SINGLE ACT "CONNECTED WITH" THE CHARGED OFFENSE ERRONEOUSLY RELIEVED THE STATE OF ITS BURDEN OF PROOF.

XIII. SEVERAL PIECES OF EVIDENCE WERE ADMITTED ALTHOUGH THE STATE FAILED TO ESTABLISH A COMPLETE CHAIN OF CUSTODY.

XIV. THE CIRCUIT COURT SHOULD NOT HAVE ALLOWED THE STATE TO CALL JERRY SMITH BECAUSE THE PROSECUTOR HAD FAILED TO PROVIDE APPELLANT WITH PRETRIAL NOTICE OF THIS WITNESS.

XV. THE TRIAL JUDGE SHOULD HAVE EXCLUDED IDENTIFICATION TESTIMONY REGARDING JEROME SMITH AND A RED AND WHITE AUTOMOBILE, AS SUCH TESTIMONY WAS UNRELIABLE AND TAINTED BY SUGGESTIVE INFLUENCES.

XVI. THE PROSECUTOR'S SUMMATION AT THE GUILT-INNOCENCE STAGE INCLUDED A NUMBER OF IMPROPER COMMENTS.

A. MR. CROOK ARGUED FACTS THAT WERE IRRELEVANT AND NOT IN EVIDENCE WHEN HE URGED JURORS TO FIND JEROME SMITH GUILTY BECAUSE TED BUNDY WAS CONVICTED ON THE BASIS OF CIRCUMSTANTIAL BITE-MARK EVIDENCE, AND DISCUSSED HIS OWN DRIVING TIME FROM HOME TO THE COURTHOUSE IN AN EFFORT TO REBUT APPELLANTS' ALIBI DEFENSE.

B. THE PROSECUTOR IMPROPERLY FOCUSED JURORS' ATTENTION ON THE WORTH OF THE VICTIM AND THE DESIRES OF HIS FAMILY.

XVII. THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT JEROME SMITH TOOK MONEY FROM THE VICTIM BY PUTTING HIM IN FEAR OF IMMEDIATE INJURY TO HIS PERSON, AND THUS WAS INSUFFICIENT TO ESTABLISH THE ROBBERY ELEMENT OF CAPITAL MURDER.

XVIII. THE JURY'S GUILTY VERDICT WAS LEGALLY INADEQUATE BECAUSE IT WAS NOT SIGNED BY THE JURY FOREPERSON.

**XIX. THE TRIAL COURT IMPROPERLY REMOVED VENIRE MEMBER TERETHA TAYLOR BECAUSE SHE COULD NOT DEFINE "MITIGATING" AND "AGGRAVATING" CIRCUMSTANCES, ALTHOUGH SHE NEVER INDICATED WHAT HER VIEWS WERE ON THE DEATH PENALTY, LET ALONE THAT THEY WOULD IMPAIR HER FROM CONSIDERING A DEATH SENTENCE.**

**XX. THE PROSECUTOR'S SYSTEMATIC USE OF HIS PEREMPTORY CHALLENGES TO RID THE JURY OF BLACK VENIRE MEMBERS, TOGETHER WITH OTHER INDICIA OF RACIAL DISCRIMINATION, MANDATES THAT THIS CASE BE REMANDED TO THE CIRCUIT COURT TO REQUIRE THE ASSISTANT DISTRICT ATTORNEY TO PROVIDE CREDIBLE, RACE-NEUTRAL REASONS FOR THESE STRIKES.**

**XXI. JEROME SMITH'S RIGHT TO COUNSEL WAS VIOLATED WHEN THE TRIAL JUDGE REFUSED TO APPOINT THE ATTORNEY WHO HAD REPRESENTED HIM THROUGHOUT THE PRETRIAL STAGE, AND INSTEAD SUBSTITUTED NEW LAWYERS ONE MONTH BEFORE TRIAL.**

**XXII. IT WAS IMPROPER FOR THE TRIAL COURT TO PROVIDE THE PROSECUTOR WITH AN EX PARTE DISCOVERY ORDER, AND TO ALSO ENGAGE IN EX PARE COMMUNICATIONS WITH LAWYERS FROM THE STATE ATTORNEY GENERAL'S OFFICE.**

**XXIII. JEROME SMITH'S RIGHTS UNDER MISSISSIPPI AND FEDERAL LAW WERE VIOLATED WHEN THE STATE FAILED TO PROVIDE HIM WITH AN INITIAL APPEARANCE, A PRELIMINARY HEARING, OR ANY PRETRIAL JUDICIAL DETERMINATION THAT THERE WAS PROBABLE CAUSE TO CHARGE AND JAIL HIM IN THIS CASE, AND INSTEAD WAITED THREE MONTHS, UNTIL JEROME WAS INDICTED, TO VALIDATE HIS ARREST AND DETENTION.**

¶2. We find no reversible error as to the guilt phase and affirm Jerome's conviction of capital murder. However, because the trial court improperly instructed the jury as to Jerome's parole eligibility, we reverse for resentencing.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. At approximately 9:00 p.m. or soon thereafter, on the night of November 7, 1992, Johnny B. Smith ("Johnny B."), was killed in the liquor store he owned in Sidon, Mississippi, as the result of three gunshot wounds. Taken from the store were a cash register and an extra cash drawer. Also missing was Johnny B.'s handgun which was either a .32 or .38 caliber weapon. The projectiles recovered from Johnny B.'s body and from the scene were consistent with those of a .38 caliber weapon. Steve Byrd, a forensic scientist at the Mississippi Crime Laboratory, testified that the type of bullets recovered, along with their markings, indicated that they were probably fired from a revolver and not a semi-automatic weapon. Found on the counter at the scene was a bottle of Seagram's gin in a brown paper bag. A latent fingerprint and palm print were lifted from the paper bag and identified as matching those of appellant, Jerome Pete Smith.

¶4. John Stewart and Lyndell Hunt testified that they were in Sidon and drove by the liquor store between

9:00 and 10:00 on the night of the murder and saw a red and white car parked between a tin two-story building and the post office, near the liquor store. They both stated that they saw two or three men next to the car, and one was carrying an object with a cord dangling from it. The witnesses testified that they thought it might have been a VCR, but they could not tell since they only saw the bottom of it. The State suggested that it was the cash register stolen from the liquor store. One of the men they saw near the car ducked under the steps of the building as if trying to hide. Mack Crigler, who was with Stewart and Hunt that night, did not notice a red and white car, but he did see the men with the object with the cord hanging from it.

¶5. Jerry Smith, the victim's brother as well as a deputy with the Leflore County Sheriff's Department, testified on rebuttal that he was on duty in Sidon on the night of the murder. He and Deputy J.B. Henry were patrolling the area in Henry's patrol car when they drove past the tin building and post office. Deputy Smith saw a red car parked near the buildings. He stated that he noticed that the car had small double windows and a burned place near the exhaust. He also noticed a spot on the ground where the car was leaking transmission fluid. Deputy Smith testified that he saw two people sitting in the car, and as the patrol car passed by they slid down in their seats. After passing the car, the deputies crossed the railroad track and went back to the sheriff's office where Deputy Smith dropped off Deputy Henry and went out again. He then received the call that there had been a shooting.

¶6. At trial, Deputy Smith identified a picture of the car Jerome and Clyde had been in the night of the murder as the car he saw parked near the liquor store. He stated that he had also personally examined and identified the car when it was in the custody of the sheriff's office. On cross-examination, Deputy Smith stated that when he passed the car the night of the robbery, although he saw the burned spot near the exhaust, he did not notice the reflective butterfly emblem on the back of the car.

¶7. Kevin Smith, the victim's thirteen year old son, was at his father's store just minutes and perhaps seconds before the robbery and murder. His father had called him to come get his jeep which was parked in front of the store. Kevin testified that as he was leaving the store and walking toward the jeep he saw two black men run toward the store. The men were wearing dark clothes and coats and one had on a cap. Kevin identified a cap recovered by the police outside the store after the murder as the one he had seen one of the men wearing that night. Kevin stated that the two men came within five or six feet of him as he was getting in the jeep. One of the men went into the store, and the other stayed outside. Kevin then left in the jeep.

¶8. At trial, Kevin identified Jerome and Clyde as the men he saw that night. In a photographic lineup several days after the shooting, Kevin picked out a picture of Jerome as possibly being one of the men he saw that night, and as the one he saw going into the store. He did not pick out Clyde's picture, and in fact, he picked out that of another man. Jimmy Tindall, Chief Deputy for the Leflore County Sheriff's Department, conducted the photographic lineup. He testified that although Kevin did not pick out Clyde's picture, Kevin stated that if he saw him in person he would probably be able to identify him.

¶9. Witnesses place Johnny B. still alive shortly before 9:00 p.m., on the night of his murder. His wife, Jeannette Smith, testified that she left Johnny B. alone at the store around 8:00 that night. A neighbor knocked on her door some time around 9:00 or 9:15 to tell her Johnny B. had been shot.

¶10. Peyton Crigler, Johnny B.'s cousin, was at the liquor store visiting from 8:30 until about 10 minutes before 9:00 p.m. At approximately 9:15 p.m. Crigler drove back past the store and saw one person inside

who he took to be Johnny B., although he could not really tell who it was. Crigler then drove down a gravel road that connects with Highway 49. He stated that he was going approximately 30 miles per hour when a car came up behind him and passed him. Tommy Peoples found the broken cash register from the liquor store the next morning on the side of Highway 49, south of Sidon about three miles from the gravel road that Crigler was traveling when passed by the car.

¶11. Carolyn Pearce testified that around 2:00 a.m. on the morning after the murder, she was with Jerome and Clyde in a red and white car in Indianola. When she got into the car the brothers bought a $20 rock of crack cocaine. She testified that Clyde told her if she was nice to them they would come back and buy $300 or $400 more. She saw Clyde with a lot of loose bills.

¶12. Pearce stated that they started driving toward the outskirts of town so she grabbed the steering wheel. Jerome then pulled out what Pearce described as a "big silver revolver" and began hitting her arm with it. At some point Clyde got into the back seat with her and pulled out a knife and held it to her throat. Then Jerome and Clyde exchanged seats and weapons. The brothers made her take off her clothes and get out of the car naked. Clyde threw her clothes in the street. Outside the presence of the jury, Pearce stated that both men raped her before putting her out of the car.

¶13. J.D. Roseman, Isola Chief of Police, was a patrolman at the time of the murder. Sometime between 3:15 and 3:30 a.m. after the robbery and murder, Roseman was on patrol when he spotted a red and white automobile leaving Gresham Service Station in Isola. Roseman went to the service station to see if anything was wrong.

¶14. Roseman then followed the car and noticed that it was weaving some. He stopped the vehicle and turned his spotlight on the car. Roseman walked up to the car and shined his flashlight so that he could see the driver and the front seat passenger. He asked the driver, who he recognized as Clyde Smith, to step out of the car. He recognized the passenger as Jerome Smith. Roseman noticed the two seemed nervous, and he asked Clyde what they were doing at the service station. Clyde stated that the car was running hot and they were trying to get some water. Roseman told Clyde that if he would follow him to the fire station they could get some water. Clyde declined, stating that he thought they would make it.

¶15. After talking with Clyde for a few minutes, Roseman decided to let him go. Clyde got back in the car, but when he cranked it, it went dead. Roseman shined his flashlight on the temperature gauge and saw that it read normal. Roseman stated that the car did not smell hot either. Clyde cranked the car again and pulled away.

¶16. Roseman stated that the car the brothers were in was a 1972 white-on-red Ford Elite. After allowing the brothers to leave, he thought he remembered the town of Sunflower running the car's description and license plate earlier. Sunflower advised him that it had no problems with the vehicle. Roseman then advised the Humphreys County Sheriff's Department to keep an eye out for the vehicle because the brothers were acting suspicious. He ran the license plate and learned it was registered to Clyde and Jerome's sister, Dorothy Smith ("Dot").

¶17. Roseman then got a radio call from the Inverness Police Department that two black males in a red car had picked up a woman "and was trying to mess with her". Roseman also received a radio call from Tim Goad, a Humphreys County deputy sheriff, who stated that there had been radio traffic from Greenwood that a red and white vehicle was believed to be involved in a robbery and murder in Sidon. Roseman

advised Goad that he had just stopped a vehicle matching that description, and he would try to locate the car again.

¶18. Eventually, Roseman met the vehicle going very slowly on Old Highway 49. He radioed Deputy Goad and told him where he had located the vehicle. He stated he was going to turn around and follow it until Goad arrived. Roseman then turned around and began following the vehicle with his lights off so he would not be seen. The vehicle pulled over to the side of the road and stopped. Roseman also stopped about 75 to 100 yards behind the car and waited for Goad to arrive. He was not aware that the brothers had exited the vehicle and were walking down the road.

¶19. Deputy Goad testified that before he got to the location he saw two men who he recognized as Clyde and Jerome Smith, walking down the road about 50 to 75 yards from their car. Before he realized who he had seen, Goad had already passed them. By the time he turned around the brothers had run into a cotton field. Goad and Roseman searched for the men for several minutes, but could not find them.

¶20. While Roseman continued to search, Goad approached the now abandoned vehicle. Goad testified that he shined his flashlight on the inside of the car to see if the keys were still in it. When he did not see the keys, he shined his flashlight on the floorboards. On the back floorboard on the driver's side, he saw a sawed-off .410, single-shot shotgun. He confiscated the shotgun at that time. Goad also found a set of keys stuck in between the fold of the passenger seat. These keys were later identified as fitting the lock on the Sidon Liquor Store where the robbery and murder had earlier taken place.

¶21. Another search of the vehicle by Horace Miller, an investigator with the Mississippi Highway Patrol, turned up a black and white bandanna and a receipt from the Indianola Burger King that showed a purchase at 1:34 a.m. on November 8, 1992. A search of the field where Goad saw Jerome and Clyde run turned up a knife. Henry Bryant, the boyfriend of one of Jerome and Clyde's sisters, identified the knife as a hunting knife he loaned to Clyde a week before the murder. Carolyn Pearce also identified the knife as the one Clyde had pulled on her.

¶22. Bryant went on to testify about a conversation he had with Jerome and Clyde on the day of the murder. He stated that the brothers were at his house that Saturday afternoon when Clyde mentioned that he was broke and needed some money. Bryant testified that Clyde said that all you had to do was find a place without many police and you could get away with something. Bryant also stated that Jerome had a shiny revolver with him that day, but he did not know what type of gun it was.

¶23. Jerome and Clyde presented an alibi defense. Clyde's girlfriend, Cassandra Jefferson, testified that Clyde was at her house in Belzoni all day until about 8:30 p.m. when he left with Jerome, their sister Dot, and their mother. Jefferson testified that Clyde and Jerome returned to her house at approximately 9:30 p.m. Shortly thereafter, the two left in Dot's red and white car. Jefferson did not see either of the brothers again until around 8:30 or 9:00 the next morning when they showed up at her house on foot.

¶24. Jerome and Dot, testified that a little after 8:00 p.m. on November 7, 1992, she and her mother picked up Clyde at Cassandra Jefferson's house and brought him back to their mother's house. Dot stated that Jerome was already at the house asleep. At approximately 8:45, Clyde and Jerome left in her car, a 1975 white-on-red Ford Elite. She did not see the two again until the next morning.

¶25. Yvonne Stewart, the owner of the Isola Lounge in Isola, Mississippi, testified that Jerome and Clyde

entered her business sometime around 10:00 on the night of November 7, 1992. Stewart testified that she knew the time to be close to 10:00 p.m., because when the brothers came in she was on the way out to walk next door to the grocery store to buy ice. The grocery store closed at 10:00 p.m., and when she got there the doors were locked, but she could still see the owners inside counting money. Stewart stated that Jerome and Clyde stayed at the lounge only for five or ten minutes before again leaving.

¶26. The authorities, which consisted of the sheriff's departments of Leflore, Sunflower, Humphreys and Holmes Counties, the Mississippi Highway Patrol, and the police departments of Greenwood, Belzoni and Itta Bena, started searching for Clyde and Jerome before daylight on Sunday, November 8, 1992. A K-9 unit and the Highway Patrol helicopter were able to follow the tracks from where the brothers went in to the cotton field until they reached the town of Belzoni. By noon the police had obtained warrants for Clyde and Jerome. Later, they received information that the two were at their brother Elijah's apartment in Sunflower. Ricky Banks, the Leflore County Sheriff, along with members of the Sunflower Police Department, went to Elijah's apartment. Elijah told them that Jerome and Clyde were not there. However, when the police went in to search the apartment, Jerome and Clyde were present, placed under arrest, and transported back to the Leflore County jail.

## DISCUSSION

### I. THE TRIAL COURT ERRED IN TELLING JURORS THAT JEROME SMITH WOULD BE ELIGIBLE FOR PAROLE IF SENTENCED TO LIFE IMPRISONMENT, IN RESPONSE TO A MID-DELIBERATIONS QUESTION FROM THE JURY, AND IN GIVING A JURY CHARGE AND ALLOWING CLOSING ARGUMENTS FROM THE PROSECUTOR AND CODEFENDANT WHICH HIGHLIGHTED JEROME'S PAROLE ELIGIBILITY AND MISLEADINGLY SUGGESTED HE MIGHT BE RELEASED IMMINENTLY IF NOT SENTENCED TO DIE.

¶27. After approximately three hours of penalty phase deliberations the jury sent out a note which read:

The jury is aware that Clyde Smith has been sentenced in the past with life without parole.

Our question is, if we sentence Jerome Smith to a life sentence, will he be eligible for parole?

Over Jerome's objections, the trial judge returned the note to the jury with a written answer which read:

Jerome Smith will be eligible to be considered for parole.

/s/ Gray Evans, Circuit Judge

Subsequently, the jury returned a verdict sentencing Jerome to death.

¶28. Jerome argues that by informing the jury that if given a life sentence he would be eligible to be considered for parole, the trial court committed reversible error. Jerome maintains that the trial court's actions were exacerbated by comments made during sentencing phase closing argument by both Clyde's attorney and the prosecutor. According to Jerome, the jury instructions and comments by Clyde's attorneys focused the jury's attention on Jerome's potential for parole. The comments were to the effect that because of his previous life-without-parole sentences Clyde would not be eligible for parole.

¶29. During closing arguments, Clyde's attorneys tried to convince the jury that Clyde was less deserving of the death penalty than Jerome. At one point Clyde's counsel argued:

There is another difference in these two defendants. This man, Clyde, Sunday, the day before this trial started was serving four life sentences without parole, and I can tell you regardless of what you heard on T.V. about how people serve a year and a half for raping somebody on the average, or whatever statistics they come up with, I can tell you and the law will tell you and this Court will tell you, he will never see the outside of a prison cell until he dies in prison. Now that's before we got here. That's the case and it's still the case, and sentence by life from you won't affect it. It won't lessen it, it won't override it, it won't take the place of it. Those sentences are there and he will serve that time, and he never will get out. There's the difference between these two people right there.

At another point, Clyde's attorney told the jury:

He will never get to pay his debt so he can put it behind him. He can't do five years and get out and say to himself, "It was a bad mistake but I paid for it, now I can move along." He can never pay for it.

¶30. Jerome also takes issue with the following statement made by the prosecutor in the rebuttal portion of the State's closing argument:

And he's not--they are not going to be able to seek forgiveness and they're not going to be able to pay their debt to society and do the things that people with freedom can do. What did they do, ladies and gentlemen, after they took this man's life? Is this what we want them to be able to do at some point after they say, "Oh, we have been forgiven," to around, to drink whiskey, smoke marijuana, buy cocaine, mess with women. That's what they were doing.

Jerome argues that these statements, especially the trial court's answer to the jury's mid-deliberations question concerning Jerome's parole eligibility, were clear violations of this state's case law.

¶31. This Court has repeatedly held that except in habitual offender cases, where a life sentence would automatically mean life-without-parole, the parole issue should not be considered by the sentencing jury. *Blue v. State*, 674 So. 2d 1184, 1194-96 (Miss. 1996); *Mackbee v. State,* 575 So. 2d 16, 40-41 (Miss. 1990); *Williams v. State,* 544 So. 2d 782, 798 (Miss. 1987); *Cabello v. State,* 471 So. 2d 332, 346 (Miss. 1985). In this state's original case on this issue, *Williams v. State,* 445 So. 2d 798, 812-14 (Miss. 1984), this Court held that:

A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue.

Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.

First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. Mississippi Code Annotated Section 47-7-3(1) (Supp. 1982). It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder. *Johnson v. State,* 416 So. 2d 383, 392 (Miss. 1982).

Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. ***Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,*** 442 U.S. 1, 11, 99 S. Ct. 2100, 2105, 60 L. Ed. 2d 668, 677 (1979); ***Davis v. State,*** 429 So. 2d 262, 263 (Miss. 1983). Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how *ten years in the future* the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by Section 99-19-105(3)(a).

*Williams,* 445 So. 2d at 813 (emphasis in original).

¶32. This Court has reaffirmed this holding on several occasions. *See **Blue v. State***, 674 So. 2d 1184, 1194-96 (Miss. 1996); ***Mackbee v. State,*** 575 So. 2d 16, 40-41 (Miss. 1990); ***William v. State,*** 544 So. 2d 782, 798 (Miss. 1987); ***Cabello v. State,*** 471 So. 2d 332, 346 (Miss. 1985).

¶33. The State argues that the case at bar can be factually distinguished from these prior cases. First, the State argues that the court did not instruct the jury that if Jerome was not given the death penalty he would be eligible for parole, rather he informed them that Jerome would only be eligible to be "considered" for parole. Furthermore, the State argues, that as an habitual offender Clyde had every right to inform the jury that a life sentence would mean life-without-parole. *See **Mackbee,** supra;* ***Turner v. State,*** 573 So. 2d 657 (Miss. 1990). According to the State, after hearing this the jury would naturally be curious as to Jerome's parole eligibility, and had the trial court not answered the question the jury would have been left to speculate. The State suggests that since it has been held that informing a jury of parole eligibility is not constitutionally violative, ***Caldwell v. Mississippi,*** 472 U.S. 320 (1985), that under the circumstances of this case, where the brothers asked to be tried together, an exception should be made. The State further argues that any error in giving the instruction in this case was harmless beyond a reasonable doubt. ***Hansen v. State,*** 592 So. 2d 114 (Miss. 1991).

¶34. The State is correct in its assertion that Clyde had a constitutional right to inform the jury that he was an habitual offender and would not be entitled to parole eligibility if given a life sentence. However, this Court has not extended this right to defendants who are not habitual offenders. Regardless of the fact that the brothers were tried together, we decline to make an exception to our previous rulings here. Under this Court's prior rulings in *Williams* and its progeny, the trial court's actions in this case were in error and require a reversal of the sentence of death.

**II. ALTHOUGH HE FILED A PRETRIAL MOTION DEMANDING NOTICE OF AGGRAVATING CIRCUMSTANCES AND EVIDENCE, JEROME SMITH WAS NOT INFORMED, UNTIL THE BEGINNING OF THE PENALTY PHASE OF HIS TRIAL, THAT THE PROSECUTION WOULD BE RELYING ON THE PREVIOUS-VIOLENT FELONY AGGRAVATING FACTOR AND WOULD BE OFFERING PROOF OF TWO PRIOR AGGRAVATED ASSAULT CONVICTIONS.**

**A. THE DENIAL OF PRETRIAL NOTICE OF THE STATE'S INTENT TO INTRODUCE APPELLANT'S PRIOR AGGRAVATED ASSAULT CONVICTIONS VIOLATED MISSISSIPPI LAW.**

**B. THE DENIAL OF PRETRIAL NOTICE OF THE STATE'S INTENT TO INTRODUCE APPELLANT'S PRIOR AGGRAVATED ASSAULT CONVICTIONS VIOLATED THE**

**EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

¶35. In this issue, Jerome argues at length that the State committed reversible error in failing to provide him with pre-trial notice that it would be relying on the prior violent felony aggravating circumstance, or that it would present evidence concerning his prior aggravated assault convictions to support that aggravating circumstance, even though appellant filed a pre-trial motion demanding such notice. Jerome argues that such lack of notice prevented his attorneys from being prepared to challenge these convictions and from presenting evidence of "Jerome's peripheral role in, and Clyde's principal responsibility for, the incident that gave rise to these aggravated assault convictions".

¶36. Jerome has offered no Mississippi case as authority that a capital defendant is entitled to pretrial notice that the State will rely on the prior violent felony aggravating factor and notice of the specific convictions that will be offered to prove this factor. The majority of Jerome's authority espouses only the requirement that Mississippi law requires a defendant, who is to be tried as an habitual offender or pursuant to some other sentence-enhancement statute, to be given notice in the indictment of the previous convictions that will be relied upon by the State to support the sentence enhancement. *See Lacy v. State,* 629 So. 2d 591, 595 (Miss. 1993); *Benson v. State,* 551 So. 2d 188, 195-96 (Miss. 1989).

¶37. This Court in *Williams v. State,* 445 So. 2d 798 (Miss. 1984), held that a capital murder indictment need not inform the defendant as to which aggravating factors the prosecution might rely on in seeking the death penalty. The Court in *Williams* held that:

> The major purpose of an indictment is to furnish the accused such a description of the charges against him as will enable him to adequately prepare his defense. *Westmoreland v. State,* 246 So. 2d 487 (Miss. 1971); *Woods v. State,* 200 Miss. 527, 27 So. 2d 895 (1946). Thus, all that is required in this regard is a concise and clear statement of the elements of the crime charged. *Love v. State,* 211 Miss. 606, 52 So. 2d 470 (1951). Nothing more is required.
>
> We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. In our opinion, Williams received adequate notice.

*Williams,* 445 So. 2d at 804-05 (footnote omitted). The *Williams* Court also rejected comparisons to the habitual offender statutes and Unif. Crim. R. Cir. Ct. P. 6.04. *See Williams*, 445 So. 2d at 805, n.1.

¶38. However, this Court finds that Jerome was given pretrial notice that the State intended to rely on the prior-violent-felony aggravating circumstance. On June 10, 1993, the State filed two documents with the circuit clerk's office, each entitled "Notice of Aggravating Circumstances". The style of one document read "State of Mississippi v. Jerome Pete Smith" while the other was styled "State of Mississippi v. Clyde Wendell Smith". Although there was one filed for each of the brothers, the body of both documents read, "Comes now the State of Mississippi and gives the Defendant, Clyde Wendell Smith, notice . . ." This was an apparent clerical error, and one Jerome's attorneys tried to take advantage of at trial. Prior to the sentencing phase, the following colloquy took place:

**MR. JONES:** Your Honor, before we get to that with respect to Jerome Smith there was a motion for and it was granted with respect to and there was a notice of aggravating circumstances presented by the district attorney's office that didn't say anything about Jerome Pete Smith, talked about Clyde Smith, so there were--there was no notice of aggravating circumstances as to--

**THE COURT:** Well, Mr. Jones, that's a noble try. I think that puts you on notice sufficiently.

The Court holds that the trial court was correct in finding that Jerome had adequate notice. Two documents were filed, one styled "State v. Jerome Pete Smith", and even though the body contained Clyde's name, the aggravators listed in the documents were not exactly the same. Clyde had the additional aggravator of "the capital offense was committed by a person under a sentence of imprisonment". Jerome's attorney should have known or at least inquired as to whether the name Clyde in the body of the document was in error. There was sufficient time prior to trial to investigate the matter. This Court finds this issue to be without merit.

### III. THE JURY'S DEATH-SENTENCING VERDICT WAS LEGALLY INADEQUATE BECAUSE THE JURORS FAILED TO FIND THAT JEROME SMITH HIMSELF KILLED, INTENDED TO KILL, ATTEMPTED TO KILL, OR CONTEMPLATED THAT LETHAL FORCE WOULD BE USED, AND BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT SUCH FINDINGS.

¶39. In this issue, Jerome correctly states that Miss. Code Ann. § 99-19-101(7) (1994) forbids a jury from imposing a death sentence, unless it makes a written finding that "the defendant actually killed", "the defendant attempted to kill", "the defendant intended that a killing take place", or "the defendant contemplated that lethal force would be employed". The United States Supreme Court in *Enmund v. Florida,* 458 U.S. 782 (1982), held that such a finding is also required by the Eighth Amendment to the United States Constitution.

¶40. In the case *sub judice*, when the jury returned the separate verdicts at the conclusion of the sentencing phase, the *Enmund* findings, with respect to Jerome, read as follows:

We, the jury, as to Jerome Pete Smith, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:

1) that the *defendants* actually killed Johnny Smith;

2) that the *defendants* intended the killing of Johnny Smith take place; and

3) that the *defendants* contemplated that lethal force be employed.

(emphasis added).

¶41. Jerome argues that inasmuch as the verdict contained the word "defendants" and not "defendant" that the jury failed to make an individual finding that Jerome personally either killed, intended to kill, or contemplated the use of lethal force, and therefore, the resulting death sentence violated the Eighth and Fourteenth Amendments, as well as the holding in *Enmund v. Florida,* 458 U.S. 782 (1982), and the laws of this state. Jerome argues that when the jury used the word "defendants" it meant to convey that these findings applied to one or the other of the two defendants, but not necessarily both. Jerome maintains

that since the jury used the word "defendants" there was no individualized finding as to his culpability, and therefore the sentence should be reversed.

¶42. The State first argues a procedural bar. The jury's verdict was copied directly from this sentencing instruction. Neither Jerome nor Clyde objected to Instruction S-1, to the form of the verdict at trial, or in their motions for new trial. Accordingly, the State argues that this claim has been waived and cannot be raised for the first time on appeal. *Ballenger v. State,* 667 So. 2d 1244, 1259 (Miss. 1995); *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992); *Moawad v. State,* 531 So. 2d 632, 635 (Miss. 1988).

¶43. Jerome cites to *Pinkton v. State,* 481 So. 2d 306 (Miss. 1985), to support his argument that because of the jury's use of the plural "defendants" there was no individualized finding as to his culpability as required by Miss. Code Ann. § 99-19-101(7) (1994). In *Pinkton*, the defendant pled guilty to capital murder, the killing having occurred during an attempted armed robbery. A sentencing trial was then held, and the death penalty imposed. The jury failed to make a separate finding of culpability as required under Miss. Code Ann. § 99-19-101(7), but instead "embarked directly upon the framing of findings relating to the aggravating circumstances". *Pinkton,* 481 So. 2d at 309.

¶44. The question presented to this Court was "whether such an explicit finding is indispensable or whether it can be implied from the other findings or from the plea of guilty in the guilt phase". *Id.* In answering the question, the Court stated that its decision was to be controlled by the statute and not by federal constitutional considerations, and that the statute was not ambiguous. "A separate, explicit and written jury finding in accordance with the subsection is indispensable to the valid imposition of the death penalty." *Id.* at 310.

¶45. The State in *Pinkton* argued alternatively that Pinkton was procedurally barred from raising the issue on appeal, since there was no contemporaneous objection to the judge's failure to instruct the jury on the requirement for a § 99-19-101(7) finding. This Court found the argument without merit, stating:

> Although a more complete instruction might have prevented the jury's omission, that omission is nonetheless an event legally distinct from the judge's failure to instruct. The jury's obligation in this matter, is after all, independently imposed by the statute without reference to any action by the judge. Once this is understood, the state's argument immediately faLls. Pinkton could raise no objection to the jury's dereliction until after its verdict was rendered, and then it was too late.

*Id.* at 310.

¶46. The case at bar differs from *Pinkton* in that the jury was instructed to return separate written findings as required by § 99-19-101(7) for both Jerome and Clyde, and it did so. The only real issue that must be resolved is whether the jury's use of the plural "defendants" somehow made the finding invalid.

¶47. A somewhat similar argument, as Jerome makes here, was made in *Conner v. State,* 632 So. 2d 1239, 1277 (Miss. 1993). There Conner sought reversal because in listing the aggravating circumstances in its written verdict, the jury included the word "whether" before each aggravating factor listed. Conner argued "that the jury's use of the word 'whether' at the beginning of each clause indicate[d] that the jury merely 'parroted' the jury instruction and failed to engage in the mandatory fact-finding process". *Conner*, 632 So. 2d at 1277. This Court, in rejecting Conner's argument, stated:

Conner doomed this assignment of error before he ever raised it by failing to object to the verdict's form at trial. But, even if the objection were preserved, it has not merit. No one can reasonably conclude, on grounds that the word "whether" repeatedly appears in the verdict, that the jury did not fulfil its fact-finding duties. The verdict would certainly win no grammar award, but its meaning is perfectly clear. The jury found that all five aggravating circumstances existed and that the aggravating circumstances carried more weight than did mitigating circumstances.

*Id.* (internal citations omitted).

¶48. A similar argument can be made here. Sentencing Instruction S-1 informed the jury that it was to return separate verdicts for Jerome and Clyde. S-1 read in part:

The verdict you return must be written on a separate sheet of paper signed by the foreman. Your verdict should be written in one of the following forms:

1. We, the Jury, as to Jerome Pete Smith, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:

(List or itemize all facts found, if any, from the list under Section A of this instruction which you unanimously agree exist in this case beyond a reasonable doubt.)

Section A of the instruction read as follows:

To return the death penalty in this case you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts existed:

1. That the Defendants actually killed Johnny Smith; or

2. That the Defendants intended the killing of Johnny Smith take place; or

3. That the Defendants contemplated that lethal force would be employed.

¶49. The plural "Defendants" was used in S-1 because one instruction was submitted for both defendants. The jury when writing the separate verdicts for Jerome and Clyde copied the wording as it was written in the instruction. This does not mean that the jury did not make an individualized finding as to each defendant. What it does show is that the jury determined that each of the three factors applied equally to both Jerome and Clyde. The jury clearly intended these factors to apply to Jerome as it prefaced this section of its verdict with the words "as to Jerome Pete Smith".

¶50. Jerome goes on to argue that aside from the allegedly fatal flaw in the jury's verdict, there was insufficient evidence, as a matter of law, to demonstrate beyond a reasonable doubt Jerome's culpability under § 99-19-101(7) and *Enmund*.

¶51. This Court's standard of review of a jury's findings under *Enmund* and Miss. Code Ann. § 99-19-101(7) was set out in *Abram v. State,* 606 So. 2d 1015, 1041-42 (Miss. 1992), as follows:

On appeal, "we review the evidence and all reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. We have no authority to disturb the [jury] verdict short of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no

rational trier of fact could have found the fact at issue beyond a reasonable doubt." ***White v. State,*** 532 So. 2d 1207, 1220 (Miss. 1988). This is the guide for testing the legal sufficiency of the evidence to support a finding under §99-19-101(7). . . .

¶52. The question that must be answered here is whether there was sufficient evidence presented at trial to support, as to Jerome, a finding that he killed, intended a killing to take place, or contemplated that lethal force would be used. "Mississippi by statute requires more in the felony-murder scenario than major participation and reckless indifference to the value of human life." ***Abram,*** 606 So. 2d at 1042. *See also **Carr v. State,*** 655 So. 2d 824, 839 (Miss. 1995). The phrase "contemplation that lethal force will be used" has been defined as "[w]here, as a part of the pre-crime planning, a defendant includes in his plans the substantial probability that fatal force will be employed. . ." ***Abram,*** 606 So. 2d at 1043 (quoting ***White***, 532 So. 2d at 1220-21).

¶53. The record reveals that while Clyde was more than likely the instigator of the robbery in this case, Jerome was a major participant. Henry Bryant, the boyfriend of Dot, testified that on the day of the robbery and murder, the brothers were at his house. He testified that Clyde made the comment that he was broke and needed money. During the conversation, Bryant stated to Clyde that it was hard to rob someone and get away with it. According to Bryant, Clyde responded by saying that if you go to a small town with few police then you can get away with it. The robbery and murder in the case before this Court, fit the scenario perfectly, with the exception being that the brothers got caught. Bryant went on to testify that Jerome had in his possession on the day of the murder a shiny silver revolver and Clyde had a hunting knife. Carolyn Pearce also testified that the brothers were carrying the aforementioned weapons following the murder.

¶54. The description of the weapon in Jerome's possession on the day of the murder was that he was carrying a revolver. The State's forensics expert testified that the projectiles recovered from the victim's body and the scene of the crime were consistent with having been fired from a .38 caliber revolver. Furthermore, Kevin Smith, the victim's son, identified Jerome in a photographic lineup several days after the murder as the man he saw enter the store shortly before the shooting occurred. Jerome's fingerprint and palm print were also found on a paper bag containing a bottle of liquor sitting on the store's counter.

¶55. This Court holds that a fair-minded juror could make a reasonable inference from these facts that Jerome, who entered the store armed with a revolver intent on robbery, actually killed, intended that a killing take place, or at the very least, contemplated the use of lethal force. We, therefore, find this issue is without merit.

### IV. THE CIRCUIT COURT'S INSTRUCTIONS TO THE JURY AT THE SENTENCING STAGE WERE FATALLY FLAWED.

### A. THE LOWER COURT IMPROPERLY DEPRIVED JEROME OF HIS RIGHT TO FULL CONSIDERATION OF ALL STATUTORY MITIGATING FACTORS, WHEN IT CHARGED THE JURY ON THE MITIGATING CIRCUMSTANCE THAT CLYDE WAS A LESSER PARTICIPANT IN THE CRIME, BUT DID NOT GIVE THIS INSTRUCTION AS TO JEROME OR AN INSTRUCTION ON THE SUBSTANTIAL-DOMINATION MITIGATING FACTOR.

¶56. Jerome argues that his attorneys sought a sentencing phase instruction that would have told jurors to consider the statutory mitigating factors of whether appellant "acted under extreme duress or under the

substantial domination of another person" and whether Jerome "was an accomplice in the capital offense committed by another person and his participation was relatively minor". Jerome states that the trial court refused to give these charges to the jury. Jerome argues that there was sufficient evidence from which a reasonable juror might have determined that both of these mitigating factors applied to Jerome.

¶57. This issue is without merit. Although Jerome did submit an unnumbered instruction to the trial court concerning these two mitigating factors, the record shows that the word "withdrawn" was written across the first page of the instruction. Jerome may not object for a failure to instruct the jury on these mitigating factors when he withdrew the submitted instruction.

¶58. There was no record of any mention of mitigating factors by Jerome's attorneys. In fact, the only mention of either of these two mitigating factors was the following comment by Clyde's attorney:

> **MR. STUCKEY:** Well, Judge, aren't our mitigating circumstances exactly the same? I don't think it's going to create much of a problem. The age, accomplice one, and the no. 4, the general catch-all phrase. We ain't got any proof about strain, duress, and all that garbage. We're going to have to take that out.

There was no objection at this time by Jerome, nor did he ever ask the trial court to instruct the jury on these mitigating factors. The trial court had no duty to instruct the jury *sua sponte*. **Conner v. State,** 632 So. 2d 1239, 1254 (Miss. 1993).

### B. JUDGE EVANS ERRED IN REFUSING TO CHARGE THE JURY ON SPECIFIC NONSTATUTORY MITIGATING CIRCUMSTANCES.

¶59. Jerome argues that at the sentencing phase, the trial court erred in not instructing the jury as to certain specific nonstatutory mitigating factors concerning Jerome. These mitigating factors were set out in the same instruction discussed above that was marked withdrawn.

¶60. The only mention of these factors by Jerome's attorney at trial was during a discussion of what evidence could be presented at the sentencing phase. When these mitigating factors were mentioned, the trial court, after consulting Miss. Code Ann. § 99-19-101, stated that Jerome could present evidence and argue to the jury any mitigating factors that he wanted, but unless they were statutory mitigators they would not be listed in the jury instruction. Instead, the trial court gave the jury the general catch-all instruction which read:

> Consider the following elements of mitigation in determining whether the death penalty should not be imposed:

> 3. Any other matter, any other aspect of the Defendants, Clyde Wendell Smith's or Jerome Pete Smith's, character or record, and any other circumstance of the offense brought to you during the trial of this cause which you, the Jury, deem to be mitigating on behalf of the Defendants, Clyde Wendell Smith or Jerome Pete Smith.

> And any other mitigating circumstances which you the jury wich [sic] to consider even though they are not set forth above.

¶61. "This Court long has accepted the use of a 'catch-all' to encompass any mitigating circumstances not

specifically enumerated under Miss. Code Ann. § 99-19-101(6)." ***Jackson v. State,*** 684 So. 2d 1213, 1238 (Miss. 1996); ***Carr v. State,*** 655 So. 2d 824, 854 (Miss. 1995); ***Neal v. State,*** 451 So. 2d 743, 760-61 (Miss. 1984); ***Gray v. State,*** 375 So. 2d 994, 1003-1004 (Miss. 1979). Accordingly, Jerome cannot complain that he was not afforded the opportunity to instruct the jury to consider his impoverished and traumatic childhood as mitigating factors.

### C. BECAUSE ROBBERY WAS AN ELEMENT OF THE OFFENSE OF CAPITAL MURDER, ITS ADDITIONAL USE AS AN AGGRAVATING CIRCUMSTANCE WAS IMPERMISSIBLY DUPLICATIVE AND CONTRAVENED THE NARROWING REQUIREMENT OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

¶62. Jerome asserts that the trial court erred in allowing the State to use the aggravating circumstance of a murder committed during the course of an armed robbery. He argues that the use of the "felony-murder" aggravating circumstance in a felony-murder case is impermissibly duplicative, and in violation of the narrowing requirement of the Eight Amendment to the United States Constitution. Jerome cites to ***State v. Middlebrooks***, 840 S.W.2d 317 (Tenn. 1992); ***Engberg v. Meyer,*** 820 P. 2d 70, 87 (Wyo. 1991); ***Furman v. Georgia,*** 408 U.S. 238 (1972); and ***Arave v. Creech,*** 507 U.S. 463 (1993).

¶63. This so-called "doubling up" argument, which states that the use of the robbery aggravating circumstance in a robbery-murder case, does not genuinely narrow the class of defendants eligible for the death penalty, has consistently been rejected by this Court. *See****Ballenger,*** 667 So. 2d at 1260-61; ***Pinkney v. State,*** 538 So. 2d 329, 358-59 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075 (1990); ***Jones v. State,*** 517 So. 2d 1295, 1300 (Miss. 1987), *vacated on other grounds*, 487 U.S. 1230 (1988) *overruled on other grounds by* ***Willie v. State***, 585 So. 2d 660 (Miss. 1991). In ***Ballenger***, the Court stated, "[t]he 'narrowing' of the class of death eligible offenders has been done legislatively in Mississippi under Miss. Code Ann. § 97-3-19(2) (1972 & Supp. 1994)." ***Ballenger***, 667 So. 2d at 1261. *See also* ***Lowenfield v. Phelps,*** 484 U.S. 231 (1988). This issue is without merit.

### D. THE TRIAL JUDGE'S INSTRUCTIONS IMPROPERLY LED JURORS TO BELIEVE DEATH WAS THE APPROPRIATE SENTENCE IF AGGRAVATING AND MITIGATING CIRCUMSTANCES WERE IN EQUIPOISE.

¶64. Jerome takes exception to the following language in sentencing instruction S-1:

> If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

Jerome, citing ***White v. State,*** 589 A.2d 969, 973 (Md. 1991), ***People v. Young,*** 814 P. 2d 834, 839 (Colo. 1991), and ***Jackson v. Dugger,*** 837 F. 2d 1469, 1473-74 (11th Cir. 1988), argues that this language "improperly created a presumption in favor of death, in that a death sentence would result if the jurors found the aggravating and mitigating factors to be in equipoise".

¶65. The State argues another procedural bar because Jerome failed to bring the issue before the trial court. Such a procedural bar is supported by the record. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State,* 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State,* 520 So. 2d 131, 134 (Miss. 1988). *See also Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992).

¶66. Not only is this issue procedurally barred, it is without merit as well, as identical arguments have been consistently rejected by this Court. In *Davis v. State*, 660 So. 2d 1228 (Miss. 1995), the Court held:

> Davis' second contention is foreclosed by this Court's recent decision in *Conner v. State,* 632 So. 2d 1239 (Miss. 1993); *cert. denied*, . . ., 115 S. Ct. 314, 130 L. Ed. 2d 276 (1994). Conner, like Davis, argued "that a proper instruction would permit imposition of the death penalty only where the jury finds that aggravating circumstances outweigh mitigating circumstances, not vice versa". *Conner,* 632 So. 2d at 1278. *See also Shell v. State,* 554 So. 2d 887, 904 (Miss. 1989), *rev'd on other grounds*, 498 U.S. 1, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990); *Jordan v. State,* 365 So. 2d 1198, 1206 (Miss. 1978),*cert. denied*, 444 U.S. 885, 100 S. Ct. 175, 62 L. Ed. 2d 114 (1979); *Gray v. Lucas,* 677 F. 2d 1086, 1105-06 (5th Cir. 1982), *cert. denied,* 461 U.S. 910, 103 S. Ct. 1886, 76 L. Ed. 2d 815 (1983). We rejected this argument in *Conner*, and today, we find no reason to vary from our holding in *Conner*. Accordingly, Davis merits no relief on this issue.

*Davis,* 660 So. 2d at 1245. *See also Doss v. State,* No. 93-DP-00509-SCT, 1997 WL 770606 (Miss. Dec. 15, 1997) (Identical language complained about here found to be acceptable.)

¶67. The sentencing instruction complained of in the case at bar does not create a presumption of death nor does it require the sentencing jury to return a verdict of death if mitigating and aggravating factor are equipoise. This Court finds this issue lacking merit.

### V. THE PROSECUTOR ENGAGED IN MISCONDUCT BY MAKING NUMEROUS IMPROPER COMMENTS DURING HIS CLOSING ARGUMENT AT THE SENTENCING STAGE.

¶68. Jerome takes issue with several statements made by the prosecution during its sentencing phase closing argument. He contends that the comments were improper and highly prejudicial, and when considered as a whole, require reversal.

¶69. Once again, the record reveals no objection by the defense to any of these statements. As was recently reiterated by this Court in *Davis v. State,* 660 So. 2d 1228 (Miss. 1995), "[a] contemporaneous objection must be made to allegedly erroneous comments made during closing argument or the point is waived."*Id.* at 1251 (*citing Foster v. State,* 639 So. 2d at 1289; *Gray v. State,* 487 So. 2d 1304 (Miss. 1986); *Shavers v. State,* 455 So. 2d 1299 (Miss. 1984)).

¶70. Not only was this issue not preserved for appeal, it is also without merit. First, Jerome contends that the prosecutor spoke of the importance of the sentence on the victim's family, suggesting that these survivors desired the death sentence be imposed. The record does not bear out this contention. Nowhere does the prosecutor encourage the jury to impose the death penalty because it is important to the victim's survivors. Instead, the prosecutor points out to the jury that the case involves real people, not just exhibits. Given the wide latitude generally afforded counsel in closing argument, taken together with the failure to

object, this claim must fail. *See* ***Hansen v. State,*** 592 So. 2d 114, 139-40 (Miss. 1991); ***Johnson v. State,*** 416 So. 2d 383, 392 (Miss. 1982); ***Gray v. State,*** 351 So. 2d 1342, 1346-47 (Miss. 1977).

¶71. Next, Jerome argues that the prosecutor misinformed the jury as to the law by telling it that since it had already returned a guilt phase verdict of capital murder against Jerome, that it necessarily included the death-penalty culpability findings that he actually killed, intended to kill, attempted to kill, or contemplated lethal force would be used. Again, Jerome misstates the prosecutor's comments. Instead, the prosecutor stated that by returning a guilty verdict against both Jerome and Clyde, the jury had already determined that at least one of the two brothers had such culpability. Again, given the wide latitude generally given counsel in closing argument, taken together with the failure to object, this claim must fail. ***Hansen,*** 592 So. 2d at 139-40.

¶72. Next, Jerome argues that the assistant district attorney commented to the jury that he had personal knowledge of the seriousness of Jerome's prior convictions. Again, Jerome misrepresents the prosecutor's comment. At one point during closing argument the prosecutor asked the jury to consider the level of Jerome's previous convictions and the level of the offense for which he was now being tried. He then stated, "Please consider the level of the offense. I beg you to do that. Capital murder. This is not a pair of brass knuckles, some street person. I tried the case, and it wasn't a street person." In making this comment the prosecutor is clearly referring to the case at bar and not Jerome's previous convictions. As previously stated, given the wide latitude generally given counsel in closing argument, taken together with the failure to object, this claim must fail. ***Hansen,*** 592 So. 2d at 139-40.

¶73. Jerome contends that he was highly prejudiced by arguments of the prosecutor of the special heinousness of the murder. The alleged prejudicial arguments that the victim was shot in the back while fleeing from his assailant after having been struck by another bullet is not supported by the record. Instead, the prosecutor set out a possible scenario in an attempt to rebut arguments made during closing arguments by the defense that this was not a "bad" murder. As previously stated, given the wide latitude generally given counsel in closing argument, taken together with the failure to object, this claim must fail. ***Hansen,*** 592 So. 2d at 139-40.

¶74. Lastly, Jerome contends that the prosecutor improperly urged the jury to determine one defendant's punishment in part based on the sentence it imposed on the other. Again, Jerome completely misstates the record. During the State's rebuttal closing arguments at the sentencing phase, the prosecutor made the following comment which, in his brief, Jerome takes the single phrase, "something less than" out of context:

> And somehow or another there is a difference between planning and doing. I don't understand that, that he went on to say that there's a difference in a degree of meanness and that Clyde somehow or another deserves less punishment than Pete. Is he saying that if you for some reason or another decide that Pete should not suffer the death penalty that Clyde should get something less than that? No, that doesn't wash. No, ma'am.

¶75. In making this comment, the prosecutor is telling the jury it can give Clyde the death penalty, even if it decides to give Jerome life imprisonment. The prosecutor does not, as Jerome suggests, tell the jury that since Jerome was the probable triggerman, that if Jerome does not get the death penalty, neither can Clyde.

¶76. None of these comments to which Jerome now complains were so prejudicial, either individually or cumulatively, as to require reversal. Accordingly, this Court finds this issue to be both waived for failure to

make a contemporaneous objection and without merit.

**VI. THE DEATH PENALTY IS A DISPROPORTIONATE PUNISHMENT IN LIGHT OF THE GRAVE UNCERTAINTY AS TO WHETHER JEROME SMITH ACTUALLY KILLED THE VICTIM AND OTHER DISTINGUISHING FEATURES OF THIS CASE.**

¶77. In this issue, Jerome maintains that his sentence of death is "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant". Miss. Code Ann. § 99-19-105 (3)(c) (1994). Jerome cites *Reddix v. State*, 547 So. 2d 792, 795 (Miss. 1989) and *Bullock v. State*, 525 So. 2d 764, 770 (Miss. 1987), to argue, *inter alia*, that since it was not conclusively proven that he was the actual triggerman a reversal of his death sentence is justified in this case.

¶78. Jerome argues that there was also compelling mitigating evidence presented at trial which showed that Jerome was under the substantial domination of his older brother, Clyde, with respect to the robbery of the victim's store and other actions engaged in by the two brothers. Jerome claims he suffered an impoverished, traumatic childhood as the last of nine children, since he was raised by siblings because his father was institutionalized in an insane asylum and his mother worked as a maid to save the family from starvation. Jerome urges this Court that "in light of these factors, a death sentence for this 20-year old African-American youth is disproportionate under Miss. Code Ann. § 99-19-105, and thus should not be upheld".

¶79. The State argues that *Reddix* and *Bullock* are distinguishable from the case *sub judice* and are inapplicable. The State urges this Court to hold the death penalty was not disproportionate to the crime in this case considering the circumstances and Jerome's character.

¶80. In both *Reddix* and *Bullock*, a plurality of this Court found the death penalty to be disproportionate and remanded the case for the imposition of a life sentence. At the time of the trial in those cases *Enmund v. Florida* had not yet been decided.

¶81. In *Reddix*, the appellant was eighteen years of age at the time of the crime and suffered from mental illness and mild retardation. Reddix and his accomplice, Larry Jones, planned to rob Arthur Weinberger. Reddix distracted Weinberger while Jones hit him with a wrench. This Court in finding Reddix' sentence of death to be disproportionate discussed the holding in *Bullock*:

> Our proportionality decision in *Bullock*, rested on the fact that, with only two exceptions, "no capital defendant has had a death sentence affirmed in this state where the sole finding was that he contemplated that lethal force would be used". *Bullock,* 525 So. 2d at 770. We also noted that Bullock's accomplice, the actual killer, had received a life sentence, a point reinforcing our determination that justice required fixing Bullock's sentence at life imprisonment. *Id.* The same is true here.
>
> * * *
>
> Accordingly, we hold that Reddix' death sentence is disproportionate to the penalty imposed in similar capital cases, considering both the crime and the appellant.

*Reddix,* 547 So. 2d at 794-95.

¶82. This Court has affirmed death sentences where the appellants were not the actual killers. In *Stringer*

*v. State,* 454 So. 2d 468 (Miss. 1984)*, cert. denied,* 469 U.S. 1230 (1985), Stringer, while not the actual triggerman, "was the instigator, the planner, the master-mind, and the one who directed the entire occurrence. According to the testimony of the two participants, the attempted armed robbery and the killing would not have occurred had it not been for appellant." *Stringer,* 454 So. 2d at 479. In *Leatherwood v. State,* 435 So. 2d 645 (Miss. 1983), this Court affirmed Leatherwood's sentence of death although he did not do the actual killing. This Court found it sufficient that Leatherwood "planned, schemed, and ultimately physically subdued the victim by choking him with a rope, while another stabbed and bludgeoned the victim to death." *Leatherwood,* 435 So. 2d at 656.

¶83. More recently in *Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995), the jury's sentence of death was unanimously affirmed by this Court even though Ballenger was not even present when the actual robbery and beating that resulted in the victim's death took place. In affirming, the Court held, "like Stringer and Leatherwood, [Ballenger] instigated and planned the robbery of Ellis. Her actions secured others to kill."*Id.* at 1268.

¶84. The case at bar can be distinguished from all the above cited cases, in that the evidence presented at trial shows that Jerome, more than likely, was the triggerman. Henry Bryant, the boyfriend of Dot, testified that on the day of the robbery and murder, the brothers were at his house. He testified that Clyde discussed how to commit a robbery without getting caught. Bryant went on to testify that Jerome had in his possession on the day of the murder a shiny silver revolver. Carolyn Pearce also testified that Jerome was carrying a revolver following the murder. This testimony shows that Jerome had a revolver prior to and following the murder, and evidence showed that the victim was probably killed with a revolver.

¶85. As for Jerome's contention that he was under the substantial domination of Clyde when these crimes were committed, there is absolutely no evidence in the record to support this contention. What the evidence does show is that Jerome had a revolver on the night of the murder and that the victim was killed with a revolver. The evidence also shows that Jerome was in the liquor store on the night of the murder, because his palm print and fingerprint was found on a bag containing a bottle of liquor sitting on the counter.

¶86. This Court distinguishes this case from *Reddix* and *Bullock* because here Jerome's co-defendant was also sentenced to death. And, unlike Reddix, there is no evidence that Jerome suffered from any mental illness or retardation.

¶87. After considering all the circumstances, the Court finds that the death penalty was not disproportionate in this case.

> **VII. THE TRIAL COURT ERRED IN PERMITTING JEROME SMITH TO VETO HIS ATTORNEYS' SEVERANCE MOTION, WHICH THE COURT HAD ALREADY GRANTED, AND ORDERING THAT HE BE TRIED JOINTLY WITH HIS CODEFENDANT ALTHOUGH SUCH A JOINT TRIAL WAS SEVERELY DAMAGING TO JEROME'S DEFENSE.**
>
> **A. JEROME WAS ENTITLED TO BE TRIED SEPARATELY FROM HIS CODEFENDANT UNDER MISSISSIPPI AND FEDERAL LAW.**
>
> **B. THE CIRCUIT COURT ERRED IN RESCINDING ITS SEVERANCE ORDER AND PERMITTING JEROME SMITH TO OVERRIDE HIS ATTORNEYS' DECISION TO**

**OBTAIN A SEVERANCE, BECAUSE THIS DETERMINATION WAS ONE THAT TRIAL COUNSEL, AND NOT THE CLIENT, WAS AUTHORIZED TO MAKE.**

¶88. The attorneys for both Jerome and Clyde filed motions for severance which were granted by the trial court. At a subsequent pre-trial hearing the trial court was informed that, against the advice of their attorneys, both Jerome and Clyde desired to be tried together. After Jerome and Clyde had been thoroughly questioned on the matter, the trial court rescinded the earlier order of severance allowing the brothers to be tried jointly. The trial judge indicated at that time that upon conviction the brothers would be given the option of have the sentencing phase heard separately.

¶89. Jerome now argues that the trial court committed reversible error in allowing him to override the advice of his attorney and in rescinding the order of severance. He contends that he was severely prejudiced by the joint trial, both in the guilt phase and the sentencing phase of the trial. He contends that whether to ask for a severance is a tactical decision over which the defense attorney, not the defendant, has the ultimate control. Furthermore, he argues, that under Mississippi law, a defendant in a capital case has an absolute right to a separate trial from that of a codefendant. To support his argument Jerome cites to Rule 4.04 of the Uniform Criminal Rules of Circuit Court Practice which provides that "[t]he granting or refusing of severances of defendants in cases not involving the death penalty shall be in the discretion of the trial judge". He points out that there are no reported death penalty cases in Mississippi, under the state's modern capital punishment statute, involving a multi-defendant trial.

¶90. Jerome argues that in non-capital cases the refusal to grant a severance is reversible error if it prejudices the defendant at trial, citing *Duckworth v. State,* 477 So. 2d 935, 937 (Miss. 1985) and *Price v. State,* 336 So. 2d 1311, 1312 (Miss. 1976). This prejudice occurs where there is a conflict of interest among the codefendants, especially where the defenses of the accused and his codefendant are antagonistic. *Hawkins v. State,* 538 So. 2d 1204, 1207 (Miss. 1989). *See also Tillman v. State,* 606 So. 2d 1103, 1106-07 (Miss. 1992).

¶91. The State suggests that this issue is one of first impression in this State. It is the State's contention that the record shows that Jerome was fully aware of the consequences of being tried with Jerome, and he still made that decision. The State maintains that Jerome cannot now complain of a decision or tactic that he personally asserted at trial, and he should be barred from raising this claim on appeal.

¶92. Miss. Code Ann. § 99-15-47 (1994) provides for severance as follows:

> Any of several persons jointly indicted for a felony *may* be tried separately on making application therefor, in capital cases, before the drawing of any special venire which is summoned to appear on the day the case is set for trial and in other cases, before arraignment.

(emphasis added). Nothing in this statute requires that persons jointly indicted for capital murder, where the state intends to seek the death penalty, must be tried separately. The statute only provides that co-indictees *may* be tried separately, at the trial court's discretion, when a motion for severance is timely filed. It is Rule 4.04 of the Uniform Criminal Rules of Circuit Court Practice which takes this discretion away from the trial court in cases involving the death penalty. Rule 4.04 reads:

> The granting or refusing of severances of defendants in cases not involving the death penalty shall be in the discretion of the trial judge.

The court may, on motion of the state or defendant, grant a severance of offenses whenever:

(1) If before trial it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or

(2) If during trial, upon the consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.

¶93. This rule does not say that there must be a severance in all cases involving the death penalty, only that if a motion for severance is filed, the trial court has no discretion and instead must grant the requested severance. The Rule does not require the trial court to *sua sponte* grant a severance where there has been no motion for severance filed, especially when the defendant wishes to be tried together with his co-defendant. Jerome provides no authority to support his contention that the trial court should have refused his knowing, informed, and voluntary request to be tried jointly with his brother Clyde. The only Mississippi case wherein the trial court severed the trials of jointly indicted defendants against the wishes of one of those defendants involves an instance where one of the co-defendants was unavailable to stand trial, so instead of continuing the trial as to both defendants, there was a severance. *See Thompson v. State,* 231 Miss. 624, 97 So. 2d 227 (1957).

¶94. Jerome goes on to make the argument that whether to obtain a severance was a tactical and strategic decision that his attorneys had the right to make, and the trial court should not have allowed him to override his attorneys' decision. The problem with this argument is that the trial court did not "allow" Jerome to override his attorneys' decision, rather the record suggests that his attorneys acceded to Jerome's decision, albeit against their better judgment. Therefore, no absolute right to severance was impinged upon by the trial court. None of the cases cited by Jerome involve a factual situation such as this. Most of the cases he cites involve ineffective assistance of counsel claims wherein the defendant's attorney made certain strategic decisions against the defendant's wishes, such as which witnesses to call.

¶95. The case cited by Jerome which is most closely related factually to the case at bar is *Blanco v. Singletary,* 943 F.2d 1477 (11th Cir. 1991), wherein the defendant and defense counsel openly disagreed over whether to call two witnesses, and the trial court allowed the defendant, not his attorney, to make that decision. The Eleventh Circuit ruled that "[t]he decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel" and "the trial court overreached its authority" in allowing the defendant to override his lawyer's decision. *Id.* at 1495. Again, this case is distinguishable from the case *sub judice*. Here, Jerome's attorneys, although clearly apprehensive about Jerome and Clyde being tried together, did not openly oppose the decision. Instead, they informed the trial court that Jerome wanted the order of severance rescinded. While Jerome's attorneys did state on-the-record that they had thoroughly discussed the matter with Jerome and had advised him against requesting a joint trial, they did not try to discourage the trial court from rescinding the order of severance per the Smith brothers' request.

¶96. Jerome is correct in his argument that a defendant in a capital case has an absolute right to a separate trial from that of a co-defendant, as per Rule 4.04. However, this right, as any other fundamental and absolute right, can be waived. The Supreme Court has held that "although the defendant 'may conduct his own defense ultimately to his own detriment, his choice must be honored. . .'" *Dunn v. State*, 693 So. 2d 1333, 1340 (Miss. 1997) (quoting *Godinez v. Moran*, 509 U.S. 389, 399-400 (1993)). "This Court in *Metcalf* [*v. State*, 629 So. 2d 558 (Miss. 1993),] wrote of its displeasure of defendants who would use their right to refuse counsel in an attempt to play a 'cat and mouse' game with the court, or as some strategy

to place the trial judge in a position where 'in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of Counsel.'" ***Dunn***, 693 So. 2d at 1342 (citations omitted). The case at bar presents the Court once again with a situation where a defendant attempts to manipulate the judicial process. Jerome raises as error his decision to act against the advice of his attorneys by demanding the motion for severance be withdrawn.

¶97. Because Jerome requested a joint trial, he essentially voluntarily made a knowing and informed waiver of his right to a separate trial. This issue is without merit as to the guilt phase.

¶98. This likewise applies to the trial court decision to allow the sentencing phase to be tried jointly. When it came time for the sentencing phase, the trial court stated that since the exact same aggravating circumstances applied to both Jerome and Clyde, there would be no need for separate sentencing hearings for each brother. Jerome offered no objection to this, and in fact stated he wanted a joint sentencing hearing. Prior to the commencement of the sentencing hearing, the following statements were placed on the record:

> **MR. STUCKEY**: Once again, Your Honor, for and on behalf of Clyde Smith, we have discussed the pros and cons of a joint sentence hearing, and feel that it is in the best interest of Clyde Smith to have separate sentence hearings. We discussed that many times over the last month or so and in particularly the last few days and more in particularly last night because there are some differences between he and his brother that perhaps would work against him at trial if it was a joint sentencing trial, so once again, it is against our better judgment that we conduct a joint sentencing trial. However, as I understand it, Clyde Smith is still of the opinion and desire to have a joint sentencing trial, and I wanted to ask him that on the record so we can make sure that [sic] where we are.
>
> . . . .
>
> **MR. GANDY**: Your Honor, we, on behalf of Jerome Pete Smith, Mr. Jones and I would adopt, if the Court would allow us to, the wording rather than be redundant on behalf of Pete Smith.
>
> **THE COURT**: No problem.
>
> **MR. GANDY**: We have discussed it with him, and I would like to ask him the same question. Jerome Pete Smith, has Mr. Jones and I discussed with you the circumstances and facts surrounding your sentencing hearing?
>
> **JEROME PETE SMITH**: Yes, sir.
>
> **MR. GANDY**: And it is your desire, against our advice, that you remain together during this sentencing phase.
>
> **JEROME PETE SMITH**: Yes, sir.

¶99. The Court holds that since Jerome affirmatively asked for a joint sentencing hearing, and there was no objection made when the trial court ruled that the sentencing hearing would not be severed, this issue is waived for the purposes of this appeal. ***Ballenger,*** 667 So. 2d at 1259; ***Foster v. State,*** 639 So. 2d 1263, 1270 (Miss. 1994); ***Mitchell v. State,*** 609 So. 2d 416, 422 (Miss. 1992); ***Moawad v. State,*** 531 So. 2d 632, 635 (Miss. 1988).

¶100. The non-severance of the guilt phase of Jerome's trial from Clyde's did not result in prejudice to Jerome based on the overwhelming evidence in the record before this Court. Because this case is to be reversed on other grounds as to the sentencing phase, this issue is moot. Jerome will be resentenced alone; therefore, he will suffer no prejudice as a result of the non-severance on remand.

### VIII. JEROME SMITH'S FUNDAMENTAL RIGHT TO BE PRESENT AT ALL PROCEEDINGS IN THIS DEATH PENALTY CASE WAS VIOLATED WHEN THE VOIR DIRE AND DISMISSAL OF CERTAIN JURORS, A PROCEEDING INVOLVING THE COURT'S RESPONSE TO A MID-DELIBERATIONS QUESTION FROM THE JURY, AND A PRETRIAL HEARING AT WHICH HIS ORIGINAL ATTORNEY WAS REMOVED FROM THE CASE, ALL WERE CONDUCTED IN HIS ABSENCE.

¶101. Jerome argues that the trial court committed reversible error when he was not afforded the right to be present at several allegedly critical stages of the proceedings. Jerome maintains that this violated his right to confrontation and other rights guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 3 of the Mississippi Constitution.

¶102. The first instance Jerome addresses is when the trial judge questioned a number of venire members outside the hearing of the defendant and his attorneys. Jerome argues that he had the right to be present at all trial proceedings, including these bench conferences during voir dire. To support his argument of reversible error, he cites to *Strickland v. State,* 477 So. 2d 1347 (Miss. 1985), in which this Court reversed a drug conviction where the trial court interrogated potential jurors in chambers outside the presence of the defendant or defense counsel.

¶103. The State argues that these instances complained of in the present case are factually distinguishable from *Strickland* in that the trial judge interrogated the jurors at the bench, not in chambers, and that counsel and defendant were present in the courtroom and failed to object. Nor was any objection raised to the empaneling of the jury on these or any other grounds; and therefore, the claim is deemed waived and cannot be raised for the first time on appeal.

¶104. The record reveals that while qualifying the jury panel the trial judge questioned potential jurors about statutory exclusions and exemptions. He then questioned the jurors about any hardships they would face by being sequestered for approximately a week. At this point juror Allan Goetzinger raised his hand, and after questioning on the record, the trial court excused him because he had a fifteen year old daughter at home with no one to stay with her. The trial judge then made the following statement to counsel:

> **THE COURT:** Gentlemen, do you wish me to tell you the reasons for these being excused? I'll either do so now or be glad to tell you at a later time.

To which counsel for both Jerome and Clyde replied:

> **MR. JONES:** Be fine, Judge. At a later time.

> **MR. STUCKEY:** A later time.

¶105. The trial court then questioned juror Malcolm Vail on the record and excused him because he was a farmer and needed to be planting beans. The trial court then proceeded to excuse juror William Charles Thomas, Jr. after a discussion off the record. The trial court then asked if there was anyone else, and jurors

Hattie Jordan, Christopher Davis, and Calvin Lipsey stepped up to the bench. After excusing those three the trial judge asked if there were "any more students out there who are in summer school taking final exams this week". In response, jurors William Clark, Alonzo Evans, and Amanda Montgomery approached the bench and were excused by the trial court.

¶106. At no time during these proceedings did Jerome ever object to any of these potential jurors being excused or to the manner in which they were questioned. Nor did he ever ask the judge that he be allowed to approach the bench during these conferences.

¶107. Later during the court's voir dire, the trial judge asked if the jurors could be fair. When juror Thomas H. Murphey indicated that he did not think he could be fair the following transpired:

Q. Anyone else down here? How about you?

A. (Mr. Thomas H. Murphey) Yes, sir.

Q. You can be fair?

A. I don't think so.

Q. You don't think you can?

A. No, sir.

**THE COURT:** Come up let me talk to you.

(BRIEF PAUSE IN THE PROCEEDINGS.)

(COUNSEL APPROACHED THE BENCH OUT OF THE HEARING OF THE JURY)

**THE COURT:** Postmaster at Sidon. Knows all about it. Knows the families. Says he couldn't be fair.

**MR. JONES:** No. 89.

**THE COURT:** Thomas Murphey. Mr. Murphey you're excused.

Again there was no objection to the manner in which the trial court conducted this questioning, and there was no objection to his being excused.

¶108. After a brief recess the following transpired in regard to juror Donald Moore:

**THE COURT:** No. 152. Step up, gentlemen, and let me give you this reason now.

(JUROR DONALD L. MOORE WAS EXCUSED FROM THE COURTROOM.)

(COUNSEL APPROACHED THE BENCH OUT OF THE HEARING OF THE JURY:)

**THE COURT:** He's the officer in charge of the maximum security unit at the Mississippi State Penitentiary.

**MR. MOUNGER:** And is, of course, familiar with at least one of the defendants?

**THE COURT:** Yes, sir. He has an exemption--legal exemption and the [sic] claimed it.

**MR. MOUNGER:** Right.

(BENCH CONFERENCE WAS CONCLUDED.)

Again there was no objection by the defense. All other bench conferences during the court's voir dire were placed in the record and were conducted within the hearing of the attorneys.

¶109. This same issue was addressed in *Chase v. State,* 645 So. 2d 829, 845 (Miss. 1994). In that case, the trial court excused two prospective jurors after off-the-record discussions. Unlike the case at bar, the trial court apparently did not even inform the attorneys as to the reasons for their dismissals. Chase argued that "this action violated his right to be present during the impaneling of the jury". *Id.* at 845. The *Chase* Court rejected the argument, stating:

> As has been the case in other assignments of error, there was no objection raised at the time of the alleged error. Chase also failed to object to the jurors prior to the jury being impaneled and indicated to the court that he had no objection to the selection of the jury. Since no objection was made, the issue is not properly preserved for review by this Court.

> As noted by the State, another independent basis for rejecting Chase's argument is the failure to preserve an adequate record. In *Hansen v. State,* 592 So. 2d 114, 127 (Miss. 1991), this Court stated: "It is elementary that a party seeking reversal of the judgment of a trial court must present this court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved."

*Id.* at 845.

¶110. As was the situation in *Chase*, Jerome offered no objection to the actions of the trial judge that he now asserts to be reversible error. In fact, defense counsel stated on-the-record that it was alright for the trial court to give the reasons for excusing the prospective jurors at a later time. Furthermore, Jerome made no objection to the final jury panel, nor did he raise this issue in his motion for a new trial. For these reasons, this issue has not been properly preserved for review by this Court.

¶111. Next, according to Jerome he was improperly excluded from a conference during the penalty phase deliberation in which the jury sent a written question to the trial judge asking whether Jerome would be eligible for parole if given a life sentence. The attorneys for both Jerome and the State were present, and Jerome's attorneys voiced their objection to the trial court answering the jury's inquiry. The trial judge then proceeded to submit a handwritten answer to the jury informing them that Jerome would be eligible to be considered for parole.

¶112. The only case Jerome cites in support of his argument that it was error for the trial court to give an additional jury instruction in the defendant's absence and without the defendant's voluntary waiver of his right to continuous presence because it violates his right to due process, is *Speer v. State,* 570 So. 2d 1271 (Ala. Crim. App. 1990). In that case, the Alabama Court of Criminal Appeals relies entirely on Alabama law. A number of other jurisdictions have held that a defendant does not have the right to be

present during a discussion on jury instructions.

¶113. In *Mack v. State,* 650 So. 2d 1289 (Miss. 1994), the Court, discussing whether Mack had a right be present during a pretrial motion hearing stated:

> [D]iscussions on purely legal matters are not critical stages of the proceedings. *United States v. Sherman,* 821 F.2d 1337 (9th Cir. 1987); *United States v. Graves,* 669 F.2d 964 (5th Cir. 1982) . The United States Supreme Court has determined that a criminal defendant "is guaranteed the right to be present at any stage of the criminal proceedings that is critical to its outcome if his presence would contribute to the fairness of the procedure". *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S. Ct. 2658, 2667, 96 L. Ed. 2d 631 (1987).

> This Court has not addressed the question of whether the conference on jury instructions is such a critical stage of the proceedings. . . .

> . . . .

> Although this Court has not addressed this issue, the jurisdictions which have addressed it, have held that a defendant has no constitutional right to be present at a conference which deals with legal issues, such as a conference on jury instructions. Mack's presence was not necessary to contribute to the fairness of the procedure, therefore, his absence did not violate due process. There is no merit to this contention.

*Mack*, 650 So. 2d at 1307.

¶114. The record shows that Jerome had earlier voluntarily absented himself from the discussion on the guilt phase instructions:

> **MR. MOUNGER:** Could I just make a brief statement on the record, Your Honor, that before we broke for lunch and to go over the jury instructions, we advised Clyde and Pete [Jerome] Smith both that if they wished they could be present during the instructions, and they wanted to go theirselves [sic] and have lunch.

Furthermore, there is nothing in the record to suggest that Jerome was present during the discussion of the sentencing instructions. Whether or not the trial judge should answer the jury's inquiry was purely a legal question, and so, Jerome had no constitutional right to be present.

¶115. Lastly, in this issue Jerome complains that he was not afforded the right to be present at the pre-trial hearing in which his retained attorney was allowed to withdraw, and Mr. Jones and Mr. Gandy were re-appointed as his counsel. Jerome cites *Myers v. State,* 254 So. 2d 891, 893 (Miss. 1971), as his sole authority that he had a right to be present at such a hearing.

¶116. Upon Jerome's indictment for capital murder on November 12, 1992, the lower court appointed Leland Jones and Leman Gandy to represent him in the case. Subsequently, Jerome's mother and sister retained attorney Solomon Osborne to represent Jerome. On January 13, 1993, Jerome informed Jones and Gandy that an attorney had been retained for him, and on January 19, 1993, the two filed a motion to withdraw as counsel. January 20, 1993, Osborne entered an appearance, and Jones and Gandy were allowed to withdraw with Osborne substituted as counsel. On May 24, 1993, a hearing was scheduled by

the defendant for a motion for continuance. At the commencement of that hearing the transcript reveals the following occurrence:

BY THE COURT: 22,161, Clyde Wendell Smith.

Mr. Osborne, I expect we can take up your motion a lot quicker than we can these others. Let's take your's up.

What are the grounds for your continuance?

BY MR. OSBORNE: Your Honor, this is a case in which I was retained after--well I have another motion that I want you to consider first before we get to the continuance. If you grant it there will be no need for a continuance.

This is a case in which two attorneys were appointed to represent Jerome Smith and after that his mother and sisters came to me and retained me to represent him. They. . .they paid me a portion of the fee in March of this year and sub. . .and in April, about April the 26th, they came to my office and told me that they didn't long. . .they didn't want me to represent Mr. Smith any longer and that they were not going to pay the balance of the fee, and based on that I filed a motion to withdraw as counsel.

BY THE COURT: Have you. . .have you done enough work on it to earn the fee they've paid you?

BY MR. OSBORNE: Yes, sir, I have, but I advised them that I just couldn't withdraw unless I got permission from the Court.

BY THE COURT: Well, Mr. Osborne, I'm not--I hadn't--it has not been my practice, and I'm not going to start now, to require attorneys to work for nothing where people haven't paid them, and obviously he's indigent; is that correct?

BY MR. OSBORNE: Yes, sir.

BY THE COURT: This was his family paying this?

BY MR. OSBORNE: This was his mother and sisters.

BY THE COURT: I will release you.

BY MR. OSBORNE: All right.

. . . .

BY MR. CROOK: Excuse me, Your Honor. In his motion he has asked to be allowed to withdraw as retained counsel, as I understand it, and his motion has listed in the alternative to appoint him.

BY THE COURT: Well I'm not going to appoint him, no, sir. I will appoint someone else.

BY MR. OSBORNE: All right, well thank you.

BY DEPUTY SHERIFF TINDALL: They had two appointed attorneys before they hired Mr.

Osborne. They just told them they didn't want them.

**BY THE COURT**: They didn't want them? Well it'll be the same two.

**BY MR. CROOK**: That was Mr. Jones. . . They didn't want Leman.

**BY MR. STUCKEY**: Yeah, I'll call them and tell them they got thirty days to get ready.

**BY THE COURT**: Yes, sir, that--it'll be his original appointed attorneys, we're not going to have attorney shopping between indigents.

¶117. This case is distinguishable from the *Myers* case cited by Jerome. In that case, mid-way through trial, Myers' court-appointed attorneys, out of the presence of the defendant, made a motion to withdraw as counsel, making "serious accusations" against the defendant. This Court, reversing, stated that, "[t]his was a very important and crucial stage of the case to the appellant and involved serious charges against him by his own counsel", and that under the circumstances Myers was entitled to be present while the motion was heard. *Id.* at 892.

¶118. This Court has refused to hold that a defendant always has the right to be present during a hearing on a motion for his attorney to withdraw, but instead has to look at the facts on a case-by-case basis. The Court made such a factual distinction in *Lampkin v. State,* 389 So. 2d 113 (Miss. 1980). In *Lampkin*, the defendant was represented by the law firm of Turner and Walker. Prior to trial, Bennie Turner was appointed County Prosecuting Attorney of a county in the same circuit court district as Lampkin's trial. On the morning of trial, the district attorney informed Turner that he intended to seek Turner's removal from the case for that reason. This motion was denied by the trial court. Subsequently, Turner asked to withdraw because he was uncertain of the law concerning his defense of a person in the same district covering the county attorney's residence. The trial judge allowed Turner to withdraw. Turner's co-counsel also asked to withdraw because Turner had been lead counsel. This motion was overruled. All of these proceedings were done outside the presence of the defendant.

¶119. This Court refused to reverse, stating:

> We are of the opinion that appellant had no constitutional right to be present on Turner's request to withdraw as counsel, under the facts of this case, and that no error was committed by the lower court. *See Boyington v. State,* 389 So. 2d 485 (Miss. 1980). Likewise, the record indicates that appellant's present counsel was familiar with all the facts of the case, that he adequately represented the appellant in the trial below, and that no prejudice resulted to appellant from Attorney Turner's withdrawal from the case. Therefore, the first assignment lacks merit.

*Lampkin,* 389 So. 2d at 114-15.

¶120. The case at bar is even more easily distinguishable from *Myers* than is *Lampkin*. Osborne did not ask to withdraw as Jerome's counsel mid-trial, or even on the morning of trial, as was the case in *Lampkin*, but rather, the motion came more than a month prior to trial. Furthermore, the trial court reappointed attorneys Gandy and Jones, who were already familiar with the case, having served as Jerome's attorneys for two months before Osborne was retained when they were allowed to withdraw. One final distinction is that Osborne made no allegations against Jerome which he was entitled to defend. Under the circumstances of this case, this Court finds that Jerome had no constitutional right to be present during Osborne's motion

to withdraw as counsel. Therefore, this issue is without merit.

### IX. THE TRIAL COURT SHOULD HAVE EXCLUDED AS EVIDENCE ITEMS DISCOVERED BY LAW ENFORCEMENT OFFICIALS IN A WARRANTLESS SEARCH OF APPELLANTS' CAR, WHICH WAS NOT SUPPORTED BY PROBABLE CAUSE.

¶121. Jerome contends that there was insufficient probable cause for the warrantless search of the abandoned red and white automobile, which belonged to Jerome and Clyde's sister; and therefore, the keys to the victim's store, the bandanna, and the sawed-off shotgun found pursuant to that warrantless search should not have been admitted into evidence.

¶122. A suppression hearing was held on this issue at which the officers involved in the search testified. The State asserts that the totality of the circumstances support the trial court's finding following that hearing that the officers had sufficient probable cause to search the car without first obtaining a warrant.

¶123. There has long been an automobile exception to the warrant requirement where probable cause exists. *See McNeal v. State,* 617 So. 2d 999 (Miss. 1993); *Barry v. State,* 406 So. 2d 45, 47 (Miss. 1981); *Hall v. State,* 288 So. 2d 850, 851 (Miss. 1974). Furthermore, "'[a]ny information obtained by means of the eye where no trespass has been committed in aid thereof is not illegally obtained.'" *Franklin v. State,* 587 So. 2d 905, 907 (Miss. 1991) (quoting *Patterson v. State,* 413 So. 2d 1036, 1038 (Miss. 1982)). In the case *sub judice*, the trial court found probable cause did exist at the time the officer searched the car the Smith brothers abandoned on the side of the road. This Court applies the substantial evidence, clearly erroneous standard in determining if there was substantial basis for such a conclusion on behalf of the trial court. *McNeal,* 617 So. 2d at 1007; *Turner v. State,* 573 So. 2d 657, 665 (Miss. 1990); *Rooks v. State,* 529 So. 2d 546, 554 (Miss. 1988); *Hansen v. State,* 592 So. 2d 114, 126 (Miss. 1991).

¶124. In the case *sub judice*, there is more than substantial evidence to support the trial court's finding of probable cause. The officers had just received information that a car fitting the description of the subject car was believed to have been involved in a robbery and murder, and Office Roseman had also received information that two black males in a red and white car "had picked up a young lady and was trying to mess with her". Officer Roseman, who had earlier stopped the brothers, also stated that they were acting suspiciously. Furthermore, when Officer Goad passed the brothers in his patrol car as they were walking away from the red and white car, Jerome and Clyde ran off the road and across a field. Finally, when Officer Goad shined his flashlight in the car looking to see if the keys were in it, he saw the sawed-off shotgun in plain view on the back floorboard. Taking all of the facts together as a totality of the circumstances, the Court finds that the officers had sufficient probable cause to conduct a search of the vehicle without a warrant. This issue is without merit.

### X. THE ASSISTANT DISTRICT ATTORNEY OFFERED IRRELEVANT, INFLAMMATORY, AND INADMISSIBLE OTHER-CRIMES EVIDENCE CONCERNING APPELLANTS' POSSESSION OF A SAWED-OFF SHOTGUN, THEIR COMMISSION OF AN UNSPECIFIED SEXUAL OFFENSE, AND THEIR USE OF ILLEGAL NARCOTICS.

¶125. Jerome complains of the introduction of "other crimes" evidence by the State which he contends was

unrelated to the crime charged and otherwise irrelevant. Jerome argues that the State impermissibly introduced evidence that on the night of the murder the Smith brothers sexually assaulted, pistol-whipped, and pushed Carolyn Pearce out of a moving car; that they purchased and used cocaine; and that a sawed-off shotgun was found in the red and white automobile "abandoned" by Clyde and Jerome. Jerome argues that none of these other crimes or bad acts were related to the offense of capital murder, yet all were extremely prejudicial to the defendants and violative of Miss. R. Evid. 404.

¶126. The State maintains that all of these claims are barred because of Jerome's failure to make contemporaneous objections to the testimony in the trial court.

¶127. At no point during the trial did Jerome object to the introduction of testimony of Carolyn Pearce that Jerome hit her with the pistol or that she was made to strip before Clyde threw her out of the car.[4] Accordingly, this claim has been waived and may not be raised for the first time on appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State,* 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State,* 520 So. 2d 131, 134 (Miss. 1988); *Howard v. State,* 507 So. 2d 58, 63 (Miss. 1987)). *See also Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992).

¶128. This issue also fails on the merits. The only testimony of any assault was when Pearce testified that Jerome hit her on the wrist with a big silver revolver, that Clyde put a knife to her throat, and that after he and Jerome exchanged weapons, Clyde pulled the gun on her and made her take her clothes off and get out of the car. During this testimony, Carolyn identified the knife recovered by the police in the field near the brothers' abandoned car and the knife was placed into evidence.

¶129. Jerome correctly points out that as a general rule, evidence of a crime other than the one for which the accused is being tried is not admissible. *Ladner v. State,* 584 So. 2d 743, 758 (Miss.), *cert. denied,* 502 U.S. 1015 (1991); *Rose v. State,* 556 So. 2d 728 (Miss. 1990). There are exceptions. Miss. R. Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident.

¶130. In accordance with Rule 404(b), this Court has consistently held the admission of evidence of unrelated crimes for the purpose of showing the accused acted in conformity therewith to be reversible error. *Parker v. State,* 606 So. 2d 1132, 1136 (Miss. 1992) (citing *Rose,* 556 So. 2d at 731; *Houston v. State,* 531 So. 2d 598, 605 (Miss. 1988)). That was not the purpose for the introduction of such evidence in the case at bar.

¶131. Any testimony concerning an assault was allowed to explain how Pearce was able to identify the knife and revolver. The reason for such testimony was to show that Jerome and Clyde were in possession of a revolver (the possible murder weapon) and a knife shortly after the murder. This testimony corroborates that of Henry Bryant that the brothers were in possession of a knife and revolver prior to the murder. This Court finds the testimony was therefore admissible under Rule 404(b) as to opportunity, preparation, plan, knowledge and identity. It also passes muster under Rule 403 as being more probative than prejudicial.

¶132. Jerome also takes issue with the testimony concerning the sawed-off shot gun found in the brothers' car. On direct examination, State's witness Deputy Tim Goad testified that a .410 sawed-off shotgun was taken from the car driven by the Smith brothers. The defense objected, and the shotgun itself was not introduced into evidence. Jerome argues here that the testimony itself was error under Miss. R. Evid. 404(b), since there was no evidence that the shotgun had any connection with the crime for which the defendants were on trial and the possession of the shotgun itself was a crime.

¶133. During direct examination Deputy Tim Goad testified:

A. I approached the vehicle and shined my flashlight on the inside of the car seeing if the keys were in it, anything like that. The keys were not in the car in the ignition. I shined in the black [sic] floorboard and saw a sawed-off .410, single-shot shotgun laying in the back floorboard on the driver's side.

Q. All right. And did you take that shotgun into custody?

A. Yes, sir, I did.

At this point, Jerome objected on the grounds of relevancy as to any testimony concerning the shotgun or to its introduction into evidence. After a bench conference out of the presence of the jury, the trial court sustained the objection. The only other mention of the shotgun was a casual reference later during Deputy Goad's direct testimony, as follows:

A. These are the keys I found stuck down in the seat on the red and white Ford same time I recovered the shotgun.

Jerome made no objection to this statement.

¶134. First of all, it should be pointed out that the trial court sustained Jerome's objection as to the testimony and introduction of the sawed-off shotgun. *Foster v. State,* 639 So. 2d 1263, 1282 (Miss. 1994), is instructive on this issue. In that case an accessory to the murder for which Foster was being tried commented while testifying that he and Foster had stolen a pizza in the past, a clear reference to other bad acts or crimes. On appeal, Foster argued that the comments were prejudicial and constituted reversible error. This Court rejected the argument stating:

Foster neither requested that the trial court admonish the jury to disregard the testimony, nor requested a mistrial. His only objection was sustained. We are of the opinion that any error created by Harris' unresponsive remark was effectively cured when the trial judge sustained Foster's objection.

*Foster,* 639 So. 2d at 1282. *See also* **Walker v. State,** 671 So. 2d 581 (Miss. 1995). A very similar scenario exists here. Deputy Goad made an improper comment, and Jerome's objection was sustained, but he "neither requested that the trial court admonish the jury to disregard the testimony, nor requested a mistrial". *Foster,* 639 So. 2d at 1282. Accordingly, this Court holds this issue is without merit.

**XI. THE CIRCUIT JUDGE IMPROPERLY ADMITTED A SLEW OF HEARSAY STATEMENTS BY VARIOUS WITNESSES, INCLUDING A CRUCIAL STATEMENT BY THE CODEFENDANT CLYDE SMITH, WHICH IMPLICATED JEROME IN THIS OFFENSE AND AGGRAVATED THE CRIME.**

¶135. Jerome contends that the trial court erred in admitting into evidence impermissible hearsay testimony in violation of the confrontation clause and Rules 802, 803 and 804 of the Rules of Evidence. It is elementary that unless hearsay falls under one of the exceptions found in Rule 803 and Rule 804, it is "incompetent evidence." *Quimby v. State,* 604 So. 2d 741, 746 (Miss. 1992); *Murphy v. State,* 453 So. 2d 1290, 1294 (Miss. 1984).

¶136. First, Jerome takes issue with testimony of Henry Bryant and Carolyn Pearce concerning statements made by Clyde in Jerome's presence. Bryant testified that he had a conversation with Clyde, in Jerome's presence, in which Clyde stated that the way to get away with a robbery was to pick a small town with only one sheriff. Carolyn Pearce stated that on the night of the murder Clyde, in Jerome's presence, stated that they would return to buy $400 worth of crack cocaine. Jerome made no objection at trial to either of these statements. Therefore, Jerome may not raise this issue for the first time here. *Jones v. State,* 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State,* 520 So. 2d 131, 134 (Miss. 1988); *Howard v. State,* 507 So. 2d 58, 63 (Miss. 1987)). *See also Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992).

¶137. There was one objection made on the grounds of hearsay by Clyde during Bryant's testimony:

> A. Well, we first--we first came up towards--to you know, back to Diane Munn house went to Clara house that afternoon and Dot asked us to take them to the store, you know. And we asked, "Well, where you car was?" And then she told us that--
>
> **MR. STUCKEY**: Objection, Your Honor, what Dot said about the car.
>
> **THE COURT**: Sustained.

Because the objection was sustained there can be no ground for error. *Walker v. State,* 671 So. 2d 581, 616 (Miss. 1996); *Perry v. State,* 637 So. 2d 871, 874 (Miss. 1994); *Simpson v. State,* 497 So. 2d 424, 431 (Miss. 1986).

¶138. Jerome also contests the testimony by Jerry Carver, a Leflore County sheriff's deputy, concerning statements made by the victim's wife as to what items were missing from the liquor store. Again, Jerome made no contemporaneous objection. Jerome also mentions the testimony of Carver concerning the set of keys to the liquor store found in Smith's car. The record reveals the following:

> Q. Deputy Carver, I want to hand you this set of keys and ask you if you can identify them.
>
> A. I remember this particular set of keys was turned in to the sheriff from Humphreys County, was found in or near the red '75 Ford.
>
> **MR. JONES**: I'm going to object to hearsay until you lay a predicate.

Although a ruling was never obtained on the objection, the prosecutor preceded to lay the predicate and asked Carver to identify a second set of keys given to him by the victim's wife. Thereafter, those keys were offered into evidence without objection from Jerome. After a few more questions the keys found in the Smith car were marked for identification. At this point the prosecutor asked the following question and drew an objection from Clyde's attorney:

Q. Deputy Carver, as I understand it, the exhibit marked S-5 are the keys that were recovered--

**MR. MOUNGER**: Objection, Your Honor, Mr. Jones already objected on the grounds of hearsay. I would raise that as an objection and also the reason that Deputy Carver, as I understand the testimony, has no personal knowledge of where these keys were found.

**THE COURT**: Sustained.

Because the objection was sustained there can be no ground for error. *Walker,* 671 So. 2d at 616; *Perry v. State,* 637 So. 2d 871, 874 (Miss. 1994); *Simpson v. State,* 497 So. 2d 424, 431 (Miss. 1986).

¶139. All of the other statements Jerome now alleges to be inadmissible hearsay were given without objection in the trial court. Jerome is barred from presenting the issue for the first time on appeal. *Jones v. State,* 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State,* 520 So. 2d 131, 134 (Miss. 1988); *Howard v. State,* 507 So. 2d 58, 63 (Miss. 1987)). *See also Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992).

## XII. THE TRIAL COURT'S GUILT-STAGE INSTRUCTIONS WERE TAINTED BY SEVERAL FUNDAMENTAL FLAWS.

¶140. Here, Jerome takes issue with several portions of the trial court's instruction C-CR-3 to the jury at the conclusion of the guilt phase. Instruction C-CR-3 reads in pertinent part as follows:

The Court instructs the Jury that each person present at the time and consenting to and encouraging the commission of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime, or immediately connected with it, or leading to its commission, is as much principal as if he had, with his own hand, committed the whole offense.

. . . .

If you believe from the evidence beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, that on the day testified about, the Defendant, Jerome Pete Smith, either individually or acting in concert with one other or others, did unlawfully, wilfully and feloniously kill and murder Johnny B. Smith, a human being, at a time when Jerome Pete Smith was engaged in the commission of the crime of Armed Robbery by unlawfully, wilfully and feloniously putting Johnny B. Smith in fear of immediate injury to his person by the exhibition of a firearm, a deadly weapon, and by taking money belonging to Johnny B. Smith from his person or from his presence and against his will, then it is your sworn duty to find Jerome Pete Smith guilty of Capital Murder.

## A. JUDGE EVANS' INSTRUCTION ON THE ROBBERY PRONG OF CAPITAL MURDER FAILED TO INFORM JURORS OF THE NECESSARY CAUSE-AND-EFFECT CONNECTION BETWEEN THE "PUTTING IN FEAR" AND THE "TAKING" ELEMENTS OF THIS OFFENSE.

¶141. First, Jerome contends that the jury was improperly instructed on the elements of robbery. He maintains the instruction neglected to set out that armed robbery may be established by proof that the

defendant took property by violence to the victim's person, and instead only mentioned the "putting in fear" element of robbery. He claims that the problem with the instruction is that it failed to "specifically set out the cause and effect relationship between the taking and putting in fear" elements of the offense of robbery. *Jones v. State,* 567 So. 2d 1189, 1192 (Miss. 1990). He claims that although the instruction noted the "putting in fear" element of robbery, it neglected to explain "that the state, in order to prove the elements of robbery, must show that '[i]f putting in fear is relied upon, it must be the fear under duress of which the owner parts with possession.'" *Id.* (quoting *Crocker v. State,* 272 So. 2d 664, 665 (Miss. 1973)).

¶142. It is Jerome's contention that the State's evidence clearly showed that a "surprised" victim died within seconds of being shot, and that only after the shooting did the assailant or assailants remove the cash register and spare cash drawer from the store. Since the evidence showed that victim was already dead before anything was taken from the store, he argues that the robbery could not have occurred by putting him under the duress of any fear of injury.

¶143. Jerome made no objection to the robbery portion of the instruction in the trial court. The failure to make a contemporaneous objection waives this issue for the purposes of appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State,* 606 So. 2d 1051, 1058 (Miss. 1992) (*citing Crenshaw v. State,* 520 So. 2d 131, 134 (Miss. 1988); *Howard v. State,* 507 So. 2d 58, 63 (Miss. 1987)). *See also Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992); *Moawad v. State,* 531 So. 2d 632, 635 (Miss. 1988).

¶144. This issue is also without merit. Any error in not instructing the jury that armed robbery may be established by proof that the defendant took property "by violence to the person" was, at most, harmless. Besides, as there were no eye-witnesses to the murder, it is possible to theorize that one or both of the Smith brothers took the cash register or extra cash drawer while the victim was still alive by putting him in fear of immediate injury to his person, and the victim was only shot afterward, while one or both of the brothers were exiting the scene. The evidence presented at trial would just as easily support this scenario as any other. Therefore, the facts could support the instruction given. Accordingly, this issue is without merit.

### B. JUDGE EVANS' CHARGE ON THE ELEMENTS OF CAPITAL MURDER IMPROPERLY AMENDED THE INDICTMENT BY OMITTING THE ELEMENT OF "MALICE AFORETHOUGHT".

¶145. Jerome asserts that the trial court committed reversible error by constructively amending the indictment through its instructions to the jury. The indictment in this case charged that Jerome and Clyde

> unlawfully, willfully, feloniously, and of their malice aforethought, did, then and there, kill and murder one Johnny Smith, a human being, said murder being done while Jerome Smith and Clyde Wendell Smith were engaged in the commission of the crime of Armed Robbery as defined in Section 97-3-79 of the Mississippi Code of 1972 as amended, of Johnny Smith in violation of Section 97-3-19(2)(e) of the Mississippi Code of 1972, as amended[.]"

¶146. Jerome states that the lower court's instruction to the jury made no mention of the malice element of the indictment, instead charging that Jerome Smith should be found guilty of capital murder if the jurors determined that he "did unlawfully, willfully and feloniously kill and murder" the victim during the commission of an armed robbery. According to Jerome, this omission was highly prejudicial, as it essentially

transformed the instruction into one on felony-murder, a wholly different crime than the intentional murder charged in the indictment. To support his argument that it is reversible error to instruct the jury on a crime different than that charged in the indictment, Jerome cites a number of cases including *Rhymes v. State,* 638 So. 2d 1270, 1275-76 (Miss. 1994); *Baine v. State,* 604 So. 2d 258, 260 (Miss. 1992); *Thomas v. Harrelson,* 942 F.2d 1530, 1531 (11th Cir. 1991); *Quick v. State,* 569 So. 2d 1197, 1199 (Miss. 1990); *Griffin v. State*, 540 So. 2d 17, 19 (Miss. 1989); and *United States v. Zingaro,* 858 F.2d 94, 98-99 (2d Cir. 1988). Jerome states that this Court has frequently ordered a new trial where the circuit judge gave an inadequate instruction or no instruction at all on malice, although it was an element of the charged offense, citing *Nicolaou v. State,* 534 So. 2d 168 (Miss. 1988); *Cooley v. State,* 346 So. 2d 912 (Miss. 1977); and *Newell v. State,* 308 So. 2d 71 (Miss. 1975).

¶147. This assignment must fail for several reasons, the first being it is procedurally barred. The portion of Instruction C-CR-3 that concerns us here reads as follows:

> If the State has failed to prove beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant, Jerome Pete Smith, either individually or acting in concert with one other or others did wilfully, without authority of law, and *with deliberate design to effect death*, kill Johnny Smith, a living person, by shooting him, at a time when Jerome Pete Smith was engaged in the commission of the crime of robbery, then you shall find the Defendant not guilty of Capital Murder.

(Emphasis added).

¶148. When this instruction was submitted to the trial court it read "with or without deliberate design". During the discussion of the jury instructions at trial, Clyde Smith's attorneys asked that in order to conform with the malice aforethought portion of the indictment the word "without" be stricken so that the instruction would read "with deliberate design". Jerome's attorneys also participated in the discussion concerning the change. The amendment was made, and the trial court asked if anyone had a problem with the instruction as amended. Jerome voiced no objection. Since Jerome accepted the instruction as amended, he has waived any claim of error. *See Ballenger,* 667 So. 2d at 1267; *Foster,* 639 So. 2d at 1270.

¶149. Furthermore, defense counsel was correct at trial when he stated that amending the instruction to read "with deliberate design" would make the instruction conform with the malice aforethought language used in the indictment. This is so because "[i]t has long been the case law of this state that malice aforethought, premeditated design, and deliberate design all mean the same thing." *Windham v. State,* 602 So. 2d 798, 801 (Miss. 1992) (quoting *Johnson v. State,* 475 So. 2d 1136, 1139 (Miss. 1985)).

¶150. Finally, Jerome was indicted for capital murder pursuant to Miss. Code Ann. § 97-3-19(2)(e) which does not require "any intent to kill when a person is slain during the course of a robbery." *Griffin v. State,* 557 So. 2d 542, 549 (Miss. 1990). In *Berry v. State,* 575 So. 2d 1, 13 (Miss. 1990), the defendant made a similar argument as Jerome makes here and the argument was rejected by this Court.

¶151. For the foregoing reasons, this issue is both procedurally barred and without merit.

### C. THE COURT'S INVITATION TO THE JURORS TO FIND JEROME GUILTY OF CAPITAL MURDER ON THE BASIS OF ANY SINGLE ACT "CONNECTED WITH" THE CHARGED OFFENSE ERRONEOUSLY RELIEVED THE STATE OF ITS

**BURDEN OF PROOF.**

¶152. Jerome next complains that instruction C-CR-3 allowed the jury to find him guilty of capital murder under a theory of accomplice liability if it determined that he committed "any act which is an element of the crime or immediately connected with it or leading to its commission[.]" Jerome argues that the instruction allowed the jury to convict him of capital murder, in violation of Mississippi law[(5)], even if the jury found he was merely an accessory after the fact. He gives the example that if he merely helped dispose of the cash register or money stolen from the store, but had no idea a robbery was going to occur, the instruction still allowed him to be found guilty of capital murder. Jerome argues that the trial court's use of the phrase, "immediately connected", allowed for just such an occurrence.

¶153. First, this issue is procedurally barred for failure to raise it in the trial court. *Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992). This issue is also without merit. The portion of Instruction C-CR-3 to which Jerome is objecting to here actually reads as follows:

> The Court instructs the Jury that each person present at the time and consenting to and encouraging the commission of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime, or immediately connected with it, or leading to its commission, is as much a principal as if he had, with his own hand, committed the whole offense.

This instruction clearly informs the jury that to be found guilty under a theory of accomplice liability, the defendant had to be present at the time of the crime, consenting and encouraging its commission. This precludes the jury from finding Jerome guilty of capital murder if he was only an accessory after the fact. Furthermore, an identical instruction was upheld by this Court in *Carr v. State,* 655 So. 2d 824 (Miss. 1995), stating:

> He argues that the language of S-5 creates a conclusive presumption that the jury only had to find that Carr performed an act connected with the crime, and not that he intended to commit the crime, to find him guilty of the underlying felony.

> In *Simmons v. State,* 568 So. 2d 1192 (Miss. 1990), this Court upheld a similar jury instruction, which was challenged because it did not require that the jury find beyond a reasonable doubt that the defendant had committed every element of the crime.

> We find that jury instruction S-5 sufficiently instructed the jurors on the element of intent. Furthermore, when read in the context of the jury charge as a whole, S-5 correctly placed the burden on the State to prove beyond a reasonable doubt every element of the underlying felonies with which Carr was charged.

*Carr,* 665 So. 2d at 833. Accordingly, this issue is procedurally barred and without merit.

### XIII. SEVERAL PIECES OF EVIDENCE WERE ADMITTED ALTHOUGH THE STATE FAILED TO ESTABLISH A COMPLETE CHAIN OF CUSTODY.

¶154. Jerome asserts that the State did not properly establish through testimony the chains of custody for a number of exhibits introduced at trial. He argues that because of this failure on the part of the State, the sack and liquor bottle with Jerome's fingerprint, the keys to the victim's store, the bandanna, the bullets, the

cash register tape, and the receipt from Burger King were all improperly admitted into evidence, thus requiring reversal. The State points out that no objection was made at trial on this basis and therefore this issue should be deemed waived.

¶155. At no time during trial or in his motion for new trial did Jerome object to the admission of this evidence on the basis of the State's failure to sufficiently establish the chain of custody. In fact, most of the evidence was admitted without any objection. The failure to make a contemporaneous objection bars Jerome from raising this issue for the first time on appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State,* 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State,* 520 So. 2d 131, 134 (Miss. 1988); *Howard v. State,* 507 So. 2d 58, 63 (Miss. 1987)). *See also* *Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992); *Moawad v. State,* 531 So. 2d 632, 635 (Miss. 1988). In those instances where there was an objection made to the introduction of evidence, it was on different grounds. "'The assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal.'" *Ballenger,* 667 So. 2d at 1256 (quoting *Haddox v. State,* 636 So. 2d 1229,1240 (Miss. 1994)); *See also* *Baine v. State,* 606 So. 2d 1076 (Miss. 1992); Miss. R. Evid. 103.

¶156. Furthermore, "[t]his Court has held that the test with respect to whether there has been a break in the chain of custody of evidence is whether there is an indication of probable tampering." *Nalls v. State,* 651 So. 2d 1074, 1077 (Miss. 1995); *Wells v. State,* 604 So. 2d 271, 277 (Miss. 1992); *Harrison v. State,* 307 So. 2d 557 (Miss. 1975). "[M]atters regarding the chain of custody of evidence are largely left to the discretion of the trial judge and will not be disturbed unless there appears to be an abuse of discretion." *Nalls,* 651 So. 2d at 1077; *Wells,* 604 So. 2d at 277; *Nix v. State,* 276 So. 2d 652 (Miss. 1973).

¶157. The record reflects that the State sufficiently set out the chains of custody, and there is no evidence in this case that any of the items introduced into evidence by the State were tampered with in any way. Thus, this issue is not only procedurally barred, it is without merit.

### XIV. THE CIRCUIT COURT SHOULD NOT HAVE ALLOWED THE STATE TO CALL JERRY SMITH BECAUSE THE PROSECUTOR HAD FAILED TO PROVIDE APPELLANT WITH PRETRIAL NOTICE OF THIS WITNESS.

¶158. During its case-in-chief the State attempted to call Jerry Smith, a Leflore County deputy and the victim's brother, as a witness. The defense objected because it had not been previously notified that he might be a witness or of the nature of his testimony. A bench conference was held out of the presence of the jury, and the trial court allowed the State to make a record as to what Deputy Smith's testimony would be if allowed to testify. The trial court concluded that it would be error to allow Deputy Smith to testify since his name had not been provided to the defense during discovery as a possible witness for the State.

¶159. Pursuant to the decision of the trial judge, Deputy Smith did not testify during the State's case-in-chief. However, the trial court allowed the State to call Deputy Smith as a rebuttal witness after Clyde put on several witnesses in an attempt to establish an alibi defense. On rebuttal, Deputy Smith testified that as he was patrolling Sidon on the night of the murder, he saw a red and white car with rusted spot near the exhaust pipe and a transmission leak parked near the scene of the crime shortly before the shooting. Deputy Smith stated that he later identified the car he saw that night as being the same one Clyde and Jerome abandoned on the side of the road and which was later impounded. At trial he also identified a picture of the

car driven by the brothers that night as the same one he saw near the scene of the murder.

¶160. On appeal Jerome argues that since he presented no alibi testimony the State should not have been allowed to present any rebuttal evidence as to him. He further argues that the testimony of Deputy Smith was not proper rebuttal evidence of the testimony of Clyde's alibi witnesses, but rather just an attempt to get around the discovery violation of Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice[(6)].

¶161. The State argues that Deputy Smith's testimony was proper rebuttal evidence, and that pursuant to Unif. Crim. R. Cir. Ct. Prac. 4.07[(7)] the State is not required to give notice of its rebuttal witnesses unless it demands in writing the names of the defense's alibi witnesses. The State maintains that since it made no such request for the names of Jerome's or Clyde's alibi witnesses it had no duty to give notice of its rebuttal witnesses.

¶162. The law is clear that the State has no duty to provide the defense with the names of possible rebuttal witnesses, unless the State has requested notice of alibi defense. *Deal v. State,* 589 So. 2d 1257, 1259 (Miss. 1991). *See also* Unif. Crim. R. Cir. Ct. Prac. 4.07. Such was the case here. The fact that the State first tried to put Deputy Smith on the stand during its case-in-chief has no bearing on this rule since the trial court properly refused to allow his testimony at that time.

¶163. It is a different question entirely whether Deputy Smith's testimony was proper rebuttal. Jerome argues that it was not. The Court disagrees. First Jerome argues that he put on no alibi defense, therefore, the State should not have been allowed to offer any rebuttal evidence as to him. This contention is without merit. Although the alibi witnesses were called by Clyde, their testimony attempted to present an alibi defense for Jerome as well. In fact, Jerome's attorney argued this alibi during closing arguments. Jerome offers no authority to support his argument that when a defense witness is called by only one co-defendant in a joint trial, the State may not present a rebuttal witness to that testimony if the testimony would be detrimental to both defendants.

¶164. Clyde presented a two-pronged alibi defense on behalf of himself and Jerome. First, they offered witnesses who placed the brothers in Belzoni at the approximate time the shooting occurred in Sidon. Second, they had another witness who placed them in Isola approximately an hour after the murder, the theory being they would not have had time to commit the murder in Sidon and still be able get to Isola by 10:00 p.m.

¶165. The testimony of Deputy Smith was appropriate rebuttal evidence to this testimony. It was uncontroverted that Clyde and Jerome were driving their sister's red and white Ford car on the night of the murder. Deputy Smith, in contradiction of the alibi testimony, stated that he saw a red and white car parked near the Sidon Liquor Store minutes before the robbery and murder. Deputy Smith identified photographs of the car the Smith brothers were driving on the night of the murder as the same car he had seen parked near the scene. He also testified that he identified the car in person after it had been impounded by the authorities.

¶166. "The determination of whether evidence is properly admitted as rebuttal evidence is within the trial court's discretion." *Powell v. State,* 662 So. 2d 1095, 1099 (Miss. 1995) (*citing **Wakefield v. Puckett,*** 584 So. 2d 1266, 1268 (Miss. 1991)). The trial judge did not abuse this discretion in allowing Deputy Smith to testify in rebuttal after refusing to allow him to testify during the State's case-in-chief. This issue is without merit.

**XV. THE TRIAL JUDGE SHOULD HAVE EXCLUDED IDENTIFICATION TESTIMONY REGARDING JEROME SMITH AND A RED AND WHITE AUTOMOBILE, AS SUCH TESTIMONY WAS UNRELIABLE AND TAINTED BY SUGGESTIVE INFLUENCES.**

¶167. In this issue, Jerome challenges the testimony of several witnesses identifying him and Clyde or the car being driven by them as being outside the liquor store shortly before the murder. Jerome argues that these in-court identifications were the product of suggestive influences and otherwise unreliable since no other persons or photographs of other automobiles were presented to the witnesses for comparison purposes to ensure the accuracy of the identifications. At no time during any of this referenced testimony did Jerome make any objection to the identification procedures involved, nor did he interject any objection at all.

¶168. The State asserts that this issue is procedurally barred as having been waived by the failure of the defense to make any objections to these identifications in the trial court. The failure to make a contemporaneous objection bars Jerome from raising this issue for the first time on appeal. "A trial judge will not be found in error on a matter not presented to him for decision." ***Jones v. State,*** 606 So. 2d 1051, 1058 (Miss. 1992) (citing ***Crenshaw v. State,*** 520 So. 2d 131, 134 (Miss. 1988)); ***Howard v. State,*** 507 So. 2d 58, 63 (Miss. 1987)). Furthermore, "'[t]he assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal.'" ***Ballenger,*** 667 So. 2d at 1256 (quoting ***Haddox v. State,*** 636 So. 2d 1229,1240 (Miss. 1994)); *See also **Baine v. State,*** 606 So. 2d 1076 (Miss. 1992).

**XVI. THE PROSECUTOR'S SUMMATION AT THE GUILT-INNOCENCE STAGE INCLUDED A NUMBER OF IMPROPER COMMENTS.**

**A. MR. CROOK ARGUED FACTS THAT WERE IRRELEVANT AND NOT IN EVIDENCE WHEN HE URGED JURORS TO FIND JEROME SMITH GUILTY BECAUSE TED BUNDY WAS CONVICTED ON THE BASIS OF CIRCUMSTANTIAL BITE-MARK EVIDENCE, AND DISCUSSED HIS OWN DRIVING TIME FROM HOME TO THE COURTHOUSE IN AN EFFORT TO REBUT APPELLANTS'S ALIBI DEFENSE.**

¶169. Jerome argues that two statements made by the district attorney in the State's rebuttal during the guilt phase closing arguments amounted to prosecutorial misconduct. Jerome maintains that the following comments were so prejudicial to the defense as to amount to reversible error:

Don't convict on circumstantial evidence? Ladies and gentlemen, there are convictions every day in this country. There is not one bit of difference-- you didn't hear Judge Evans tell you, "Oh, wait a minute now. Circumstantial evidence, that ain't quite as good as"--he can't tell you that because that's not the law. In fact, Ted Bundy was convicted on circumstantial evidence. Some of you may know who he was. But the circumstantial evidence that they had on Ted Bundy was a bite mark and that's all. Nobody saw him do it. Same thing with fingerprint. Fingerprint's circumstantial. The Crime Lab man didn't see him put his finger on there. Same thing. No.

Now the sheriff testified that it would take 30, 35, 40 minutes, maybe, to go from Sidon to Isola. They want you to believe that you can't do that. I live in Silver City, which is six or seven miles below

Belzoni, and from my driveway to this parking lot is 42 miles. If I leave home at 7 o'clock and I'm not going to tell you how fast I go, but if leave home at 7 o'clock, I'm here in the courthouse about 5 or 10 minutes till 8:00. Now where does that put you?

¶170. Jerome sets out the following reasons as to why these statements by the State should be cause for reversal despite the lack of contemporaneous objection: (1) Both of these statements were highly prejudicial and improperly referred to matters that were not in evidence, citing *Balfour v. State,* 598 So. 2d 731, 748-49 (Miss. 1992) and *Smith v. State,* 499 So. 2d 750, 756-57 (Miss. 1986)[(8)]; (2) Courts have condemned prosecutorial arguments that vilify the defendant or compare the accused to other notorious criminals;[(9)] (3) The "Ted Bundy" argument improperly suggested that the jury look at the limited amount of evidence that it took for a conviction in that case and use that as the legal standard for determining how much proof was sufficient for a conviction in the case at bar;[(10)] (4) The prosecutor improperly injected his own personal experience, expertise or knowledge about driving times in the area in trying to discredit the alibi defense.[(11)]

¶171. The State correctly points out that the defense made no contemporaneous objections to any of the comments Jerome now complains were improper and prejudicial. Once again the State urges this Court to apply a procedural bar for this reason. As stated several times before, since no contemporaneous objection was made, this issue was not properly preserved for appeal. *Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992); *Moawad v. State,* 531 So. 2d 632, 635 (Miss. 1988).

¶172. Procedural bar notwithstanding, this issue is without merit. This Court in *Ahmad v. State,* 603 So. 2d 843 (Miss. 1992), stated:

> Generally, attorneys on both sides in a criminal prosecution are given broad latitude during closing arguments. *See Neal v. State,* 451 So. 2d 743 (Miss. 1984), *cert. denied* 469 U.S. 1098, 105 S. Ct. 607, 83 L. Ed. 2d 716 (1984); *Bullock v. State,* 391 So. 2d 601 (Miss. 1980), *cert. denied* 452 U.S. 931, 101 S. Ct. 3068, 69 L. Ed. 2d 432 (1981). This Court has explained that not only should the State and defense counsel be given wide latitude in their arguments to the jury, but the court should also be very careful in limiting free play of ideas, imagery, and personalities of counsel in their argument to jury. *See Johnson v. State,* 477 So. 2d 196 (Miss. 1985), *cert. denied* 476 U.S. 1109, 106 S. Ct. 1958, 90 L. Ed. 2d 366 (1986), *reh'g denied* 476 U.S. 1189, 106 S.Ct. 2930, 91 L. Ed. 2d 557 (1986). Given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety. *See U.S. v. Bright,* 630 F.2d 804 (5th Cir. 1980); *U.S. v. Austin,* 585 F.2d 1271 (5th Cir. 1978).

*Ahmad,* 603 So. 2d at 846. In *Ahmad,* the appellant was convicted of felonious child abuse. During closing arguments the prosecutor made references to hostages and prisoners of war. This Court held:

> Remembering the wide latitude afforded prosecutors in closing arguments, the comments by the State when arguing for a conviction of Abdusabr Ahmad were not improper. Taken in context, the referral to prisoners of war was part of the free play of ideas, imagery, and personalities allowed in closing arguments. The referral to prisoners and hostages does not vilify Abdusabr Ahmad. It is a characterization of I.A.'s position on the day in question. It is not name-calling or a label on Abdusabr Ahmad's overall character. The State did not state that Abdusabr Ahmad was an Arab captor. The

State did not even compare Abdusabr Ahmad to Arab captors. The State simply compared I.A.'s emotions to that of a prisoner of war or hostage.

*Ahmad,* 603 So. 2d at 846. *See also **Ballenger,*** 667 So. 2d at 1269-70.

¶173. In ***Ballenger***, the prosecutor compared the defendant's participation in the crime to that of Charles Manson. This Court held that "[c]onsidering the wide latitude given to attorney on closing arguments it can not be said that these comments were so improper as to require reversal". *Id.* at 1270. As was the case in ***Ballenger***, the prosecutor never called Jerome names or personally vilified him. Unlike ***Ballenger***, Jerome's participation in the murder was not compared to that of a notorious criminal. Ted Bundy's name was only mentioned in the context of showing that cases have been decided on circumstantial evidence.

¶174. Given the wide latitude generally afforded counsel in closing argument, taken together with the failure to object to any of the comments to which Jerome now complains, this claim must fail. *See **Hansen v. State,*** 592 So. 2d 114, 139-40 (Miss. 1991); ***Johnson v. State,*** 416 So. 2d 383, 392 (Miss. 1982); ***Gray v. State,*** 351 So. 2d 1342, 1346-47 (Miss. 1977).

## B. THE PROSECUTOR IMPROPERLY FOCUSED JURORS' ATTENTION ON THE WORTH OF THE VICTIM AND THE DESIRES OF HIS FAMILY.

¶175. Jerome takes exception to the district attorney's comments concerning the victim's family and work history as well as other aspects of the victim's "worth". He states that these comments improperly misled the jury from the single relevant issue at that stage of the proceeding, that is, whether Clyde and Jerome had murdered Johnny B. Jerome asserts that the prosecutor urged the jurors to impose a death sentence because it was important to the victim's wife and son that his life not be reduced to numbers, and the town they live in not be reduced to a model. He maintains that these comments were extremely prejudicial and highly improper, citing ***Wiley v. State***, 484 So. 2d 339, 349 (Miss. 1986), *overruled on other grounds by **Willie v. State***, 585 So. 2d 660 (Miss. 1991); ***Fuselier v. State,*** 468 So. 2d 45, 53 (Miss. 1985); ***Payne v. Tennessee,*** 501 U.S. 808, 830 n.2 (1991).

¶176. As with the prosecutor's comments Jerome complained of above, he made no contemporaneous objection to these statements by the State. Furthermore, Jerome takes these comments out of context. Without ever having mentioned the death penalty, the prosecutor made the following comment:

> It's important to Jeanette Smith and Kevin Smith because, as you know and as you see now, their husband and father's life, as it is and was, is not reduced to numbers called S-1, S-2, S-5, S-12 and the town that they lived in is now reduced to a model[(12)], which is designed to represent the place where Johnny Smith lost his life.

Nowhere does the prosecutor encourage the jury to impose the death penalty because it is important to the victim's survivors. Instead, the prosecutor points out to the jury that the case involves real people, not just exhibits. Given the wide latitude generally afforded counsel in closing argument, taken together with the failure to object, this claim must fail. *See **Hansen v. State,*** 592 So. 2d 114, 139-40 (Miss. 1991); ***Johnson v. State,*** 416 So. 2d 383, 392 (Miss. 1982); ***Gray v. State,*** 351 So. 2d 1342, 1346-47 (Miss. 1977).

## XVII. THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT JEROME SMITH TOOK MONEY FROM THE VICTIM BY PUTTING HIM IN FEAR OF IMMEDIATE

**INJURY TO HIS PERSON, AND THUS WAS INSUFFICIENT TO ESTABLISH THE ROBBERY ELEMENT OF CAPITAL MURDER.**

¶177. Jerome contends that the jury was improperly instructed on the elements of robbery. He maintains the instruction neglected to set out that armed robbery may be established by proof that the defendant took property by violence to the victim's person, and instead only mentioned the "putting in fear" element of robbery. He claims that the problem with the instruction is that it failed to "specifically set out the cause and effect relationship between the taking and putting in fear" elements of the offense of robbery. *Jones v. State,* 567 So. 2d 1189, 1192 (Miss. 1990). He claims that although the instruction noted the "putting in fear" element of robbery, it neglected to explain "that the state, in order to prove the elements of robbery, must show that '[i]f putting in fear is relied upon, it must be the fear under duress of which the owner parts with possession'". *Jones v. State,* 567 So. 2d 1189, 1191 (Miss. 1990) (*quoting Crocker v. State,* 272 So. 2d 664, 665 (Miss. 1973)).

¶178. It is Jerome's contention that the State's evidence clearly showed that a "surprised" victim died within seconds of being shot, and that only after the shooting did the assailant or assailants remove the cash register and spare cash drawer from the store. He argues that since the evidence showed that victim was already dead before anything was taken from the store the robbery could not have occurred by putting him under the duress of any fear of injury.

¶179. Jerome made no objection to the robbery portion of the instruction in the trial court. The failure to make a contemporaneous objection waives this issue for the purposes of appeal. "A trial judge will not be found in error on a matter not presented to him for decision." *Jones v. State,* 606 So. 2d 1051, 1058 (Miss. 1992) (citing *Crenshaw v. State,* 520 So. 2d 131, 134 (Miss. 1988); *Howard v. State,* 507 So. 2d 58, 63 (Miss. 1987)). *See also Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994); *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992); *Moawad v. State,* 531 So. 2d 632, 635 (Miss. 1988).

¶180. This issue is also without merit. Any error in not instructing the jury that armed robbery may be established by proof that the defendant took property "by violence to the person" was, at most, harmless. Besides, as there were no eye-witnesses to the murder, it is possible to theorize that one or both of the Smith brothers took the cash register or extra cash drawer while the victim was still alive by putting him in fear of immediate injury to his person, and the victim was only shot afterward while one or both of the brothers were exiting the scene. The evidence presented at trial would just as easily support this scenario as any other. Therefore, the facts could support the instruction given. Accordingly, this issue is without merit.

**XVIII. THE JURY'S GUILTY VERDICT WAS LEGALLY INADEQUATE BECAUSE IT WAS NOT SIGNED BY THE JURY FOREPERSON.**

¶181. Jerome argues that the guilty verdict was defective and deprived him of his right to due process guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 3 of the Mississippi Constitution. At the close of the guilt-innocence stage, the jurors returned a handwritten sheet on which was written, "We, the jury, find the defendant, Jerome Pete Smith, guilty as charged, of capital murder." This verdict form was not signed by the jury foreperson or any of the other jurors. Jerome argues that this lack of signature rendered the verdict legally inadequate. To support his argument Jerome cites the following cases from other jurisdictions: *Center v. Johnson,* 750 S.W.2d 396, 398 (Ark. 1988); *People v. Harrison,* 435 N.E.2d 1211, 1213 (Ill. App. Ct. 1982); and

*Houston Fire & Casualty Ins. v. Gerhardt,* 281 S.W.2d 176, 177 (Tex. Civ. App. 1955). He also cites *Jenkins v. State,* 607 So. 2d 1171, 1180 (Miss. 1992).

¶182. None of the cases cited by Jerome support his argument. *Center* and *Gerhardt* are both civil cases, and Rules of Civil Procedure for both Arkansas and Texas require the verdict to be signed by the jurors in certain civil cases. *Harrison* is also distinguishable. In that case, Harrison was on trial on several charges. The jury returned having signed only one verdict form finding Harrison guilty of a violent crime and leaving the verdict forms for the other charges blank. The court held that the fact that the jury did not sign the other verdict forms did not mean that the jury had acquitted Harrison of those crimes and found that the trial court's action requiring the jury to continue deliberation on those charges was acceptable.

¶183. In *Jenkins*, this Court held that a jury instruction in the penalty phase of a capital murder case in which the option of death was on a separate page from the other options and was the only option which provided a space for the foreperson's signature in the verdict form could cause the jury to neglect the other penalty options. There is nothing in this case that requires the jury foreperson to sign the guilty verdict.

¶184. There is no requirement in this state that a guilty verdict, even in a capital murder case, include the signature of the jury foreperson. *See Wright v. State,* 209 Miss. 795, 48 So. 2d 509 (1950). The only verdict that must be signed by the jury foreperson is one returning a verdict of death. *See* Miss. Code Ann. § 99-19-103 (1994). This issue is without merit.

¶185. Furthermore, Jerome made no objection at trial to the form of the verdict. Therefore, this claim has also been waived. *Ballenger,* 667 So. 2d at 1259; *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994) ; *Mitchell v. State,* 609 So. 2d 416, 422 (Miss. 1992); *Moawad v. State,* 531 So. 2d 632, 635 (Miss. 1988).

> ### XIX. THE TRIAL COURT IMPROPERLY REMOVED VENIREMEMBER TERETHA TAYLOR BECAUSE SHE COULD NOT DEFINE "MITIGATING" AND "AGGRAVATING" CIRCUMSTANCES, ALTHOUGH SHE NEVER INDICATED WHAT HER VIEWS WERE ON THE DEATH PENALTY, LET ALONE THAT THEY WOULD IMPAIR HER FROM CONSIDERING A DEATH SENTENCE.

¶186. Jerome argues that the trial court excused venireperson Teretha Taylor from the jury because she could not define "mitigating" and "aggravating" circumstances, and that the trial court erred in so doing. The State contends that Taylor was not excused because she was unable to define these terms, but rather because she did not indicate whether she could or could not vote for the death penalty, and because it was unlikely that Taylor would be able to follow the instructions of the court and fulfill the juror's oath.

¶187. The record reveals several exchanges with Taylor during voir dire. The first occurred during voir dire by the court:

> Q. Now, anyone else in the front row? Yes'm? Red shirt. Have you formed an opinion on the guilt or innocence of these defendants from what you've read, seen, or heard?

> A. (Ms. Teretha Taylor) Yes.

> **THE COURT**: Come up.

(COUNSEL APPROACHED THE BENCH OUT OF THE HEARING OF THE JURY:)

**THE COURT**: What did you hear?

**JUROR TAYLOR**: Well, I read in the paper that one of those guys--

**THE COURT REPORTER**: I'm sorry. I can't hear

**THE COURT**: Did you form an opinion that they're guilty or innocent?

**JUROR TAYLOR**: No. No, I didn't.

**THE COURT**: When did you form such an opinion?

**JUROR TAYLOR**: Well, I haven't formed no opinion. You know, I have

heard it.

**THE COURT**: Well, that's what I--I thought it got to be catching. You don't have any opinion about what happened or anything from what you've read, heard, or seen? Have you fixed any opinion?

**JUROR TAYLOR**: No, I haven't.

**THE COURT**: Well, can you hear the case and try it on the law you hear from the judge and the evidence you hear from the witness stand, decide it on those two things?

**JUROR TAYLOR**: I don't know. I don't think so.

**THE COURT**: Well, why?

**JUROR TAYLOR**: I don't know. I just don't think I could decide if I hear it.

**THE COURT**: You don't believe you'd be able to make up your mind?

**JUROR TAYLOR**: No, sir. It's something that's scary to me so I--I don't know. I couldn't do it.

**THE COURT**: Y'all want to question her further?

**MR. CROOK**: What's your name?

**JUROR TAYLOR**: Teretha Taylor.

**MR. STUCKEY**: I'd like her to stay for some additional voir dire.

**THE COURT**: Well, I'm going to let you do this outside the presence of the jury. Let me mark-- what's your name?

**JUROR TAYLOR**: Teretha Taylor.

**MR. CROOK**: 225.

**THE COURT**: All right, you may be seated.

¶188. Later during voir dire by Clyde's attorney, W.S. Stuckey, the following comment was made:

Let me tell you what type of juror cannot sit in this case, and that's one who can never return a sentence of death under any circumstance. Now I believe I have on my list three people who have said they cannot return a death sentence under any circumstance no matter how bad the crime is and those people are Annie Johnson, **Teretha Taylor**, and Joe Harris. Am I correct with those three people? If you would say yes or no or something.

A. (Unidentified jurors) Yes.

¶189. Further into the proceedings the court conducted individual sequestered voir dire initially to determine whether Taylor could never return a penalty of death under any circumstances.

**<u>EXAMINATION BY THE COURT:</u>**

Q. You're Teresa [sic] Taylor?

A. Yes.

Q. Ms. Taylor, you have indicated that you have some feelings against imposing the death penalty regardless of the evidence and regardless of the law; is that correct?

A. I don't understand. Could you repeat that, please.

Q. Well, tell me what your feeling in [sic] about the penalty and then let me see if I can follow it up.

A. Well, I really don't know nothing about it, so I can't say about the death penalty.

Q. Well, what was your problem?

A. What you mean by that, what was my problem?

Q. Well, you indicated to me when you came up to the bench that you had some problems about judging your fellow man. That's what I had down not any question you had about the death penalty.

A. I don't really understand.

**THE COURT**: Gentlemen, would y'all step up.

**MR. STUCKEY**: Could I ask her one question, if I may?

**THE COURT**: Yes, sir.

**MR. STUCKEY**: Do you remember when I asked people about whether they could vote for the death penalty or not, did you raise your hand?

**MS. TAYLOR**: No. No, I didn't.

**MR. CROOK**: Let me ask her one question. Don't you have a relative who was accused--

**MS. TAYLOR**: Mitchell Taylor.

**MR. CROOK**: --Mitchell Taylor--accused of I think it was a murder case; is that right?

**MS. TAYLOR**: Yes, sir.

**MR. CROOK**: Is that what's causing you a problem about jury service?

**MS. TAYLOR**: Because I never been in an situation like this, so I'm kind of scared.

**THE COURT**: Y'all step up and let me ask you a question.

(COUNSEL APPROACHED THE BENCH OUT OF THE HEARING OF THE JUROR:)

**THE COURT**: Do y'all think in a case where the stakes are as high as these that we need a person of that limited intelligence on the jury who is not going to, from what I'm [sic] been able to determine, understand what anybody is talking about and who will likely be swayed by others. You take a chance either way. I question--

**MR. CROOK**: Well, my observation is she certainly has not responded to any question that's been asked.

**THE COURT**: She doesn't even understand the question.

. . .

**MR. CROOK**: Tabor was excused. Taylor responded to something during the Court's voir dire and had to come up here to the bench and she said something about she could be fair but couldn't--

**THE COURT**: Teresa Taylor, No. 225.

**THE CLERK**: It's 256 that you're talking about, Wally Tabor.

**THE COURT**: Well, my question still remains, gentlemen.

**MR. CROOK**: The State has no objection, Your Honor.

**MR. STUCKEY**: Your Honor, in light of the type case it is, I don't want to waive her. It might make perfectly logical sense, but I don't think I want to.

**MR. JONES**: I would agree with Mr. Stuckey.

**THE COURT**: All right, sir.

(BENCH CONFERENCE WAS CONCLUDED.)

**<u>EXAMINATION CONTINUED BY THE COURT:</u>**

Q. Ms. Taylor, are you able to understand what we're here for today?

A. I don't understand--I understand that I'm here today about a murder trial. That's the only thing.

Q. Well, do you understand that this is a case where the State has asked for a jury who could require

the State to put them to death?

A. I don't really understand that.

Q. You don't understand that?

A. Uh-uh.

Q. What is it you don't understand?

A. I really--'cause I never been in a trial situation like this, so --

Q. I understand that. I understand that, but do you understand that the death penalty is a possibility here?

A. Yes, sir.

Q. Do you understand what that means?

A. Not really, I don't.

Q. Do you understand what mitigating circumstances are?

A. No.

Q. Do you understand what aggravating circumstances are?

A. No, I don't.

Q. Do you think you could listen if we got to the second phase of the trial and listen to what the State put on where it said, "For these reasons we think that this man or these men should get the death penalty," and the defense put on and list these reasons why you couldn't -- you shouldn't assess the death penalty, do you think you could distinguish between them and with them?

A. I don't know.

**THE COURT**: She's shaking her head. I'm going to excuse you at this time. What was that number? 225. You may go. You're excused.

¶190. Clyde argues that venireperson Taylor was excused because of her "limited intelligence" in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as similar provisions of Mississippi law. He points out that pursuant to Miss. Code Ann. § 13-5-1 (1972) there is no requisite intelligence level that must be met before a person can serve on a jury. Clyde cites to *Spencer v. State,* 615 So. 2d 688 (Fla. 1993), wherein the Supreme Court of Florida held as reversible error the trial judge's *sua sponte* excusal of jurors for allegedly having low IQs. In reversing, the Court stated:

There is no legal basis for excusing a juror based on the trial judge's arbitrary evaluation of the juror's IQ. The fact that the juror was confused is no basis for excusing her in this manner. This type of sua sponte action by the trial judge also has other ramifications in this instance since the juror in question was the only black juror on the jury panel at the time she was excused.

*Id.* at 690.

¶191. Jerome argues that Taylor's confusion and less than responsive answers were the direct result of miscommunication and confusing questions asked by the trial judge and Clyde's attorneys. Jerome also latches on to the fact that the trial court asked Taylor if she understood what mitigating and aggravating circumstances were. He argues that a number of jurisdictions have held it improper to ask venire members to define legal terms that would later be explained in jury instructions, let alone to excuse ones who are unable to do so. Jerome maintains that this trial court further erred in removing Taylor for cause since she never indicated she was opposed to the death penalty or that she would be unable to follow the court's instructions.

¶192. The State asserts that defense counsel did not object when the trial court finally did excuse Taylor. For this reason, the State argues that the failure to make a contemporaneous objection bars Jerome from raising it for the first time on appeal. *Cannaday v. State,* 455 So. 2d 713, 718-19 (Miss. 1984). The State further argues that Taylor's uncertainty as to whether she could follow the law or whether she could vote to impose the death penalty was sufficient reason for the trial court to excuse her for cause.

¶193. The trial court, as a general rule, may remove a juror when it is of the opinion that the juror can not decide the case competently or impartially, *Pierre v. State,* 607 So. 2d 43, 49 (Miss. 1992), or "'. . .for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient.'" *Nixon v. State,* 533 So. 2d 1078, 1085 (Miss. 1987) (quoting 47 Am. Jur. Jury § 121 (1969)). "This Court has also stated that a defendant does not have a vested right to any particular juror but only the right to be tried by a fair and impartial jury." *Johnson v. State,* 631 So. 2d 185, 191 (Miss. 1994) (citing *Gilliard,* 428 So. 2d at 581).

¶194. In the case *sub judice* the record shows that it is highly probable that Taylor would not have been able to adequately follow the trial court's instructions and would have probably been a disruptive force had she sat on the final jury panel. Taylor even stated that she did not believe she would be able to listen to the evidence and the jury instructions and make a determination of guilt or innocence. Taylor later stated that she did not understand exactly why she was there or what the death penalty is. Her answers to the judge's and the attorneys' questions were confusing, and she stated on several occasions that being there scared her. When all the individual voir dire of Taylor is taken together, the fact that the trial court asked her if she understood what mitigating and aggravating circumstances are is of little relevance. The trial court was clearly justified in excusing Taylor. This issue is therefore, without merit.

¶195. Also, as pointed out by the State, although Jerome's attorney objected to Taylor's excusal at one point during voir dire, he did not object when the trial court actually dismissed her. Furthermore, as noted above, Jerome was not entitled to any particular juror, only to a fair and impartial jury. *Johnson v. State,* 631 So. 2d at 191. Jerome made no objection at trial to the final composition of the jury panel. For these reasons, this issue is also deemed waived for the purposes of this appeal. *Ballenger v. State,* 667 So. 2d 1242, 1251 (Miss. 1995); *Cole v. State,* 525 So. 2d 365, 369 (Miss. 1987); *Irving v. State,* 498 So. 2d 305 (Miss. 1986).

¶196. Jerome also contests the removal of venire member Donna Jean Hatfield, who when the trial court asked if there was anyone who could not read or write, approached the bench and stated that she could "read a little bit but not read [sic] good." Jerome cites *Herring v. State,* 374 So. 2d 784, 788 (Miss. 1979), in which this Court stated that a person who met all the other qualifications and can read and write

only a few words is qualified to be a juror.

¶197. Jerome did not object at trial when the trial judge dismissed Hatfield, nor did he object to the final composition of the jury panel. *Johnson v. State,* 631 So. 2d at 191. For these reasons, this issue may also be deemed waived for the purposes of this appeal. *Ballenger v. State,* 667 So. 2d 1242, 1251 (Miss. 1995); *Cole v. State,* 525 So. 2d 365, 369 (Miss. 1987); *Irving v. State,* 498 So. 2d 305 (Miss. 1986).

¶198. Jerome also contests the removal because of hardship, Allan Goetzinger, Malcom Vail, Charles Thomas, Jr., Hattie Jordan, Christopher Davis, Calvin Earl Lipsey, William Clark, Alonzo Evans, Amanda Montgomery, and John Johnson. Jerome argues that these venire members should not have been removed because the record fails to establish any reason why jury service would have been inconvenient for them.

¶199. The record reveals that while qualifying the jury panel the trial judge questioned potential jurors about statutory exclusions and exemptions. He then questioned the jurors about any hardships they would face by being sequestered for approximately a week. At this point juror Allan Goetzinger raised his hand, and after questioning on the record, the trial court excused him because he had a fifteen year old daughter at home with no one to stay with her. The trial judge then made the following statement to counsel:

> **THE COURT:** Gentlemen, do you wish me to tell you the reasons for these being excused? I'll either do so now or be glad to tell you at a later time.

To which counsel for both Jerome and Clyde replied:

> **MR. JONES:** Be fine, Judge. At a later time.

> **MR. STUCKEY:** A later time.

¶200. The trial court then questioned juror Malcolm Vail on the record and excused him because he was a farmer and needed to be planting beans. The trial court then proceeded to excuse juror William Charles Thomas, Jr. after a discussion off the record. The trial court then asked if there was anyone else and jurors Hattie Jordan, Christopher Davis, and Calvin Lipsey stepped up to the bench. After excusing those three the trial judge asked if there were "any more students out there who are in summer school taking final exams this week?" In response, jurors William Clark, Alonzo Evans, and Amanda Montgomery approached the bench and were excused by the trial court. The trial court's reasons for excusing each of these potential jurors seems legitimate. At no time during these proceedings did Jerome ever object to any of these potential jurors being excused. Nor did he ever ask the judge that these conferences be placed on the record.

¶201. In *Chase v. State,* 645 So. 2d 829, 845 (Miss . 1994), the trial court excused two prospective jurors after off-the-record discussions. Unlike the case at bar, the trial court apparently did not even inform the attorneys as to the reasons for their excusal. Chase argued that "this action violated his right to be present during the impaneling of the jury." *Id.* at 845. The *Chase* Court rejected the argument, stating:

> As has been the case in other assignments of error, there was no objection raised at the time of the alleged error. Chase also failed to object to the jurors prior to the jury being impaneled and indicated to the court that he had no objection to the selection of the jury. Since no objection was made, the issue is not properly preserved for review by this Court.

As noted by the State, another independent basis for rejecting Chase's argument is the failure to preserve an adequate record. In ***Hansen v. State,*** 592 So. 2d 114, 127 (Miss. 1991), this Court stated: "It is elementary that a party seeking reversal of the judgment of a trial court must present this court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved."

***Id.*** at 845.

¶202. As was in the situation in ***Chase***, Jerome offered no objection to the actions of the trial judge that he now asserts to be reversible error. In fact, defense counsel stated on-the-record that it was alright for the trial court to give the reasons for excusing the prospective jurors at a later time. Furthermore, Jerome made no objection to the final jury panel, nor did he raise this issue in his motion for a new trial. For these reasons, this issue has not been properly preserved for review by this Court.

> **XX. THE PROSECUTOR'S SYSTEMATIC USE OF HIS PEREMPTORY CHALLENGES TO RID THE JURY OF BLACK VENIRE MEMEBERS, TOGETHER WITH OTHER INDICIA OF RACIAL DISCRIMINATION, MANDATES THAT THIS CASE BE REMANDED TO THE CIRCUIT COURT TO REQUIRE THE ASSISTANT DISTRICT ATTORNEY TO PROVIDE CREDIBLE, RACE-NEUTRAL REASONS FOR THESE STRIKES.**

¶203. Jerome asserts a ***Batson*** claim for the first time on appeal. The final jury panel of fourteen included nine white and three black jurors and two white alternates. Jerome argues that the final jury makeup bore little demographic resemblance to the community or to the special venire. He maintains that the State systematically used its peremptory challenges to strike black venire persons in violation of the Fourteenth Amendment to the United States Constitution and Article 3 of the Mississippi Constitution without providing sufficient race-neutral reasons for the strikes as required by ***Batson v. Kentucky,*** 476 U.S. 79 (1986). The State used eleven of its thirteen peremptory challenges against black venire persons. Jerome concedes that no objection was made in the trial court, but argues that the circumstances of the case warrant a remand to the circuit court for a ***Batson*** hearing nonetheless.

¶204. In the death penalty case ***Conner v. State,*** 632 So. 2d 1239, 1264 (Miss. 1993), the appellant complained that the State intentionally struck blacks and women from the jury. The Court refused to address the issue since Conner did not object in the lower court, stating, "[t]his Court has often held that a party waives any and all claims regarding the composition of his jury if he fails to raise an objection before the jury is sworn". ***Id.*** at 1264. *See also* ***Mack v. State,*** 650 So. 2d 1289, 1297 (Miss. 1994); ***Shaw v. State,*** 540 So. 2d 26, 27 (Miss. 1989); ***Thomas v. State,*** 517 So. 2d 1285, 1287 (Miss. 1987); ***Pickett v. State,*** 443 So. 2d 796, 799 (Miss. 1983).

¶205. In the case at bar, Jerome made no objection in the trial court to any of the State's peremptory strikes, he never asked that the State articulate race-neutral reasons for those strikes, nor did he object to the final composition of the jury. For these reasons, this issue should be deemed waived for the purposes of this appeal. Furthermore, it should be noted that three blacks did sit on the final jury panel, and during jury selection these three names were put before the State at a time when it still had peremptory challenges remaining which could have been used to strike them from the jury panel.

> **XXI. JEROME SMITH'S RIGHT TO COUNSEL WAS VIOLATED WHEN THE TRIAL**

**JUDGE REFUSED TO APPOINT THE ATTORNEY WHO HAD REPRESENTED HIM THROUGHOUT THE PRETRIAL STAGE, AND INSTEAD SUBSTITUTED NEW LAWYERS ONE MONTH BEFORE TRIAL.**

¶206. According to Jerome, when at a hearing on May 24, 1993, a month before trial, his retained attorney Solomon Osborne made a motion to withdraw as Jerome's counsel or in the alternative, to be appointed, the trial court erred in not appointing Osborne as counsel. Jerome argues that since Osborne had been working on the case for several months and the two had obviously developed an attorney-client relationship, Osborne should have been appointed to handle the case instead of reappointed attorneys Jones and Gandy a "mere month" prior to trial when "they had forgotten what little they had known of the case".

¶207. The record simply does not bear out Jerome's view of the circumstances surrounding Osborne's withdrawal from the case and the reappointment of Jones and Gandy. Upon Jerome's indictment for capital murder on November 12, 1992, the lower court appointed Leland Jones and Leman Gandy to represent him in the case. Subsequently, Jerome's mother and sisters retained attorney Solomon Osborne to represent Jerome. On January 13, 1993, Jerome informed Jones and Gandy that an attorney had been retained for him, and on January 19, 1993, the two filed a motion to withdraw as counsel. January 20, 1993, Osborne entered an appearance and Jones and Gandy were allowed to withdraw and Osborne was substituted as counsel.

¶208. On May 24, 1993, there was a hearing on a motion for continuance by the defense scheduled. At the commencement of that hearing the transcript reveals the following occurrence:

> **BY THE COURT**: 22,161, Clyde Wendell Smith.
>
> Mr. Osborne, I expect we can take up your motion a lot quicker than we can these others. Let's take your's up.
>
> What are the grounds for your continuance?
>
> **BY MR. OSBORNE**: Your Honor, this is a case in which I was retained after--well I have another motion that I want you to consider first before we get to the continuance. If you grant it there will be no need for a continuance.
>
> This is a case in which two attorneys were appointed to represent Jerome Smith and after that his mother and sisters came to me and retained me to represent him. They. . .they paid me a portion of the fee in March of this year and sub. . .and in April, about April the 26th, they came to my office and told me that they didn't long . . .they didn't want me to represent Mr. Smith any longer and that they were not going to pay the balance of the fee, and based on that I filed a motion to withdraw as counsel.
>
> **BY THE COURT**: Have you. . .have you done enough work on it to earn the fee they've paid you?
>
> **BY MR. OSBORNE**: Yes, sir, I have, but I advised them that I just couldn't withdraw unless I got permission from the Court.
>
> **BY THE COURT**: Well, Mr. Osborne, I'm not--I hadn't--it has not been my practice, and I'm not

going to start now, to require attorneys to work for nothing where people haven't paid them, and obviously he's indigent; is that correct?

**BY MR. OSBORNE**: Yes, sir.

**BY THE COURT**: This was his family paying this?

**BY MR. OSBORNE**: This was his mother and sisters.

**BY THE COURT**: I will release you.

**BY MR. OSBORNE**: All right.

. . . .

**BY MR. CROOK**: Excuse me, Your Honor. In his motion he has asked to be allowed to withdraw as retained counsel, as I understand it, and his motion has listed in the alternative to appoint him.

**BY THE COURT**: Well I'm not going to appoint him, no, sir. I will appoint someone else.

**BY MR. OSBORNE**: All right, well thank you.

**BY DEPUTY SHERIFF TINDALL**: They had two appointed attorneys before they hired Mr. Osborne. They just told them they didn't want them.

**BY THE COURT**: They didn't want them? Well it'll be the same two.

**BY MR. CROOK**: That was Mr. Jones. . . They didn't want Leman.

**BY MR. STUCKEY**: Yeah, I'll call them and tell them they got thirty days to get ready.

**BY THE COURT**: Yes, sir, that--it'll be his original appointed attorneys, we're not going to have attorney shopping between indigents.

¶209. The record shows that at no time during this hearing did Osborne ask to be appointed as Jerome's counsel, but instead indicated he wished to withdraw because Jerome's mother and sisters, who had retained him, informed him they were no longer going to pay his fee. The trial court did the appropriate thing in allowing Osborne to withdraw and reappointing Jones and Gandy, who were already familiar with the case, and who, immediately upon being reappointed, filed a motion for severance. Had the trial court appointed Osborne it would have sent out a message to other indigent defendants that all they had to do to obtain the attorney of their choice was to retain him and then not pay.

¶210. None of the cases cited by Jerome in his argument of this issue are directly on point, as all involve different factual situations. *McKinnon v. State,* 526 P.2d 18 (Alaska 1974), for example, involved a situation where on the day set for trial, the trial court removed the public defender from the case against the client and attorney's wishes, because the trial judge felt the attorney and the public defender's office were incompetent. Jerome cites *Martin v. State,* 312 So. 2d 5 (Miss. 1975), to support his proposition that Osborne should have been appointed because one month was not sufficient time for Jones and Gandy to prepare for trial. In *Martin*, a young attorney was appointed on Thursday to represent a defendant scheduled to go to trial the following Monday. Clearly there is a big difference between the weekend given

the attorney in *Martin* and the month given the attorneys in this case, especially since they were already familiar with the case. Furthermore, all of the cases cited by Jerome note that an indigent defendant does not have an absolute right to the appointed attorney of his choice. *See United States v. Mills,* 895 F.2d 897, 904 (2d Cir. 1990) (citing *Morris v. Slappy,* 461 U.S. 1 (1983)).

¶211. In the case at bar Jerome's appointed attorney made a motion to withdraw, or in the alternative to be appointed, and at no time did he object to the trial court removing him from the case. Furthermore, Jerome never made it known to the trial court that he wanted Osborne to be appointed, or that he was unhappy with his appointed counsel. This issue is without merit.

### XXII. IT WAS IMPROPER FOR THE TRIAL COURT TO PROVIDE THE PROSECUTOR WITH AN EX PARTE DISCOVERY ORDER, AND TO ALSO ENGAGE IN EX PARE COMMUNICATIONS WITH LAWYERS FROM THE STATE ATTORNEY GENERAL'S OFFICE.

¶212. Here, Jerome alleges that the trial court improperly entered an order ex parte upon request of the prosecution for certain telephone records. He also alleges that the record reveals that the trial judge engaged in ex parte communications with lawyers from the state attorney general's office, in which they discussed the sentencing phase instructions. Jerome argues that these alleged ex parte proceedings and communications violated his due process and other constitutional rights and requires reversal of his conviction and sentence. As supporting authority he cites to the following: Mississippi Code of Judicial Conduct, Canon 3(A)(4); Uniform Circuit Court Rule 1.04; *Whitney Nat'l Bank of New Orleans v. Smith,* 613 So. 2d 312, 313 (Miss. 1993); *Spencer v. State,* 615 So. 2d 688 (Fla. 1993); *McKenzie v. Risley,* 915 F.2d 1396 (9th Cir. 1990); *Pack v. State,* 725 P.2d 870 (Okla. Crim. App. 1986); *United States v. Singer,* 785 F.2d 228 (8th Cir.), *cert. denied*, 479 U.S. 883 (1986).

¶213. Jerome's entire argument that the trial court engaged in ex parte proceedings with prosecutors comes from a brief discussion between the attorneys for Jerome's co-defendant, Clyde Smith and the assistant district attorney at a pre-trial motion hearing concerning only Clyde Smith. Neither Jerome Smith nor his attorneys were present at this hearing held on May 24, 1993. At the start of that hearing, the following exchange took place:

> **BY MR. MOUNGER**: Your Honor, one thing, we had previously filed a Motion to Produce and then had filed a supplemental Motion for Discovery asking for some particular items and anything else that may have come in possession of the State. Specifically we're asking for any records that they have obtained as a result of an order that the Court granted to the State ex parte for some telephone records, which there may or may not be any. I. . .
>
> **BY MR. CROOK**: There aren't any.
>
> **BY MR. MOUNGER**: There are none?
>
> **BY MR. CROOK**: Are none. Isn't that right?
>
> (No audible response from anyone)
>
> **BY MR. CROOK**: Telephone records, there are none.

**BY DEPUTY SHERIFF TINDALL**: Right.

¶214. As can be seen from a review of the record, the issue fails for several reasons. First, this hearing concerned only Clyde, therefore, there is no evidence that an ex parte order was ever entered with regard to Jerome's case. Second, an ex parte order cannot be found in the court papers. Therefore, if such an order was entered, Jerome has failed to make a complete record. *See Artis v. State,* 643 So. 2d 533, 535 (Miss. 1994); *Peterson v. State,* 518 So. 2d 632, 638 (Miss. 1987). And, third, apparently even if an ex parte order was entered, no evidence was ever produced as a result. Any error that might exist here was clearly harmless. *Hansen v. State,* 592 So. 2d 114 (Miss. 1991).

¶215. Jerome's contention that the trial court entered into ex parte communications with lawyers from the attorney general's office is not supported by the record. We can only find the following statement by the trial court during a conference concerning sentencing phase jury instructions which this Court assumes Jerome is referring to in his argument:

**THE COURT:** I would at least like to have an opportunity to talk to death control in the morning.

¶216. There is nothing in the record to indicate what the term "death control" actually refers to, nor is there any indication in the record that the trial court ever talked to the so-called "death control". At a post-trial hearing held on May 20, 1994, Jerome's attorney, Barry Fisher, questioned Judge Evans concerning this statement, asking if this referred to death penalty attorneys in the Attorney General's Office. The trial court responded by saying, "I don't know that either. I assume. I would think it probably would, yes, sir." The trial court never stated that he actually talked with anyone at the Attorney General's Office during the trial, and there is no evidence in the record that he did so. The mere statement by the trial court referred to by Jerome, without more, renders this issue meritless.

¶217. Furthermore, if in fact the trial court's comment meant that he intended to communicate ex parte with the attorney general's office regarding the case, and Jerome's attorneys found this objectionable, then that is exactly what they should have done, object. The failure to object in the trial court waives this issue for appeal purposes. *Ballenger v. State,* 667 So. 2d 1242, 1251 (Miss. 1995); *Cole v. State,* 525 So. 2d 365, 369 (Miss. 1987); *Irving v. State,* 498 So. 2d 305 (Miss. 1986).

### XXIII. JEROME SMITH'S RIGHTS UNDER MISSISSIPPI AND FEDERAL LAW WERE VIOLATED WHEN THE STATE FAILED TO PROVIDE HIM WITH AN INITIAL APPEARANCE, A PRELIMINARY HEARING, OR ANY PRETRIAL JUDICIAL DETERMINATION THAT THERE WAS PROBABLE CAUSE TO CHARGE AND JAIL HIM IN THIS CASE, AND INSTEAD WAITED THREE MONTHS, UNTIL JEROME WAS INDICTED, TO VALIDATE HIS ARREST AND DETENTION.

¶218. Jerome alleges that the record indicates that after his arrest on November 8, 1992, no judicial officer ever made a finding of probable cause to detain or charge him, and neither an initial appearance nor a preliminary hearing was ever held. Rather, he argues, the first official action was the issuance of an indictment on February 12, 1993. According to Jerome, the lack of an initial appearance and preliminary hearing violated his right to counsel, his right to be free from unreasonable searches and seizures, and other constitutional rights.

¶219. First, Jerome's contention that a judicial officer never made a finding of probable cause for his

detainment is without merit because the record reflects that he was arrested pursuant to an arrest warrant which necessarily requires such a determination before being issued. *See* Unif. Crim. R. Cir. Ct. Prac. 1.01. Jerome's allegation that he was denied an initial appearance also seems to be without merit because within four days of being arrested he had been found to be an indigent and counsel had been appointed for him. Also, both *Abram v. State,* 606 So. 2d 1015, 1029 (Miss. 1992) and *Willie v. State,* 585 So. 2d 660, 669 (Miss. 1991), which Jerome cites to support his argument of reversal error, are factually distinguishable from the case at bar. In each case the defendant was arrested without a warrant and held without an initial appearance. Although a judge was available, they were detained until after they had given incriminating statements. In the case at bar, Jerome was arrested pursuant to an arrest warrant and gave no incriminating statement prior to having an attorney appointed for him. Furthermore, as the State correctly argues, this argument has been waived as it was not raised in the trial court. *See Thomas v. State,* 645 So. 2d 1345, 1348 (Miss. 1994); *Freeland v. State,* 285 So. 2d 895, 896 (Miss. 1973). Jerome also argues that he was denied a preliminary hearing, and therefore, his conviction should be reversed.[13] He bases his argument on *Avery v. State,* 555 So. 2d 1039, 1041-43 (Miss. 1990). Jerome's reliance on *Avery* is misplaced, as it has been overruled by this Court. "[T]his Court's decision in *Mayfield v. State,* 612 So. 2d 1120 (Miss. 1992), overruled the decision in *Avery* and held that once a defendant has been indicted by a grand jury, the right to a preliminary hearing and all privileges which attach thereto are deemed waived." *Williams v. State,* 667 So. 2d 15, 21 (Miss. 1996). Jerome's argument is therefore, without merit.

## CONCLUSION

¶220. For the reasons set forth above, the Court holds that the conviction of capital murder in this case should be affirmed. However, because the jury was informed of Jerome's eligibility to be considered for parole if given a life sentence, based on this Court's prior holdings, the sentence is to be reversed and the case remanded for a new sentencing hearing.

¶221.**CONVICTION OF CAPITAL MURDER AFFIRMED. REVERSED AND REMANDED FOR A NEW SENTENCING HEARING.**

**SULLIVAN AND PITTMAN, P.JJ., AND MILLS, J., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. BANKS, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., AND SULLIVAN, P.J. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION. WALLER, J., NOT PARTICIPATING.**

**BANKS, JUSTICE, CONCURRING:**

¶222. I concur in the result reached by the majority. I write separately to note that I would reach that result based upon the additional ground that the trial court abused its discretion in vacating the severance order for the reasons set forth in my dissenting opinion in *Clyde Smith v. State*, No. 93-DP-01470-SCT.

**PRATHER, C.J., AND SULLIVAN, P.J., JOIN THIS OPINION.**

**SMITH, JUSTICE, DISSENTING:**

¶223. On appeal of his sentence to death, Defendant Jerome Smith raises the issue that the trial court committed reversible error when it answered the jury's written question regarding parole during the penalty phase deliberations. Additionally, Smith argues that since he was tried with his brother, Clyde, an habitual offender, he was prejudiced by the fact that the jury would naturally want to know his status in regards to parole as well.[(14)] The Majority is set to agree with Smith's contentions based primarily upon ***Walter Williams, Jr. v. State***, 445 So.2d 798 (Miss. 1984) and its progeny.

¶224. However, in ***Wiley v. State***, 691 So.2d 959 (Miss. 1997), this Court held that a trial court had committed no error in truthfully answering prospective jurors' questions regarding parole, and in so doing, factually distinguished ***Williams***. Wiley claimed error, because "[t]he record reflects that the trial judge was repeatedly questioned by the veniremen during *voir dire* regarding the possibility of parole in the event that a life sentence should be imposed." ***Id***. at 961. This Court held:

> Most of the cases dealing with this issue have arisen in the context of closing arguments, jury instructions, or witness's testimony. *See*, *e.g.*, ***Griffin v. State***, 557 So.2d 542, 553 (Miss.1990); ***Jessie Derrell Williams***, 544 So.2d at 798; ***Williams***, 445 So.2d at 813. The State argues that these cases should be distinguished, because the trial court in the case sub judice:

> ... steadfastly maintained that the sentencing statute stated that life in prison was the punishment. He further told the jury not to speculate about what would be done in the future as that was not their concern in considering sentence. This situation is totally different than the prosecutor making an argument that a defendant should be given the death penalty because a sentence of life imprisonment would result in parole.

> The State would submit that this is not an error requiring reversal of this third death sentence. **The trial court gave accurate information to the three prospective jurors who asked questions regarding parole eligibility. . . The jury was never instructed to consider parole eligibility in determining the sentence to be imposed.**

*Wiley,* 691 So.2d at 964. In ***Wiley***, this Court refused to extend the ***Williams*** analysis, because "[t]he trial judge followed this Court's instructions to not speculate on parole. . . . When further pressured by the veniremen for a more exact answer, the trial judge gave a truthful response." ***Id***.

¶225. ***Wiley*** is controlling in the case *sub judice*. Factually, ***Wiley*** and ***Jerome Smith*** are very similar. Both cases involve questions about parole by jurors without any prompting by the prosecution. Both cases reveal that the trial court gave accurate, truthful responses regarding the law. The only difference is in ***Wiley*** the question arose before trial during *voir dire*, and here it was afterwards during sentencing.

¶226. More importantly, in the case sub judice, the brothers asked to be tried together. At sentencing, the trial court answered truthfully when the jury, after three hours of deliberations, asked about the parole status of Jerome Smith, as follows:

JURY: The jury is aware that Clyde Smith has been sentenced in the past with life without parole.

Our question is, if we sentence Jerome Smith to a life sentence, will he be eligible for parole?

COURT: Jerome Smith will be eligible to be considered for parole.

/s/ Gray Evans, Circuit Judge.

No jury instruction was given that Jerome Smith would be eligible for parole or that the jury should consider parole eligibility in its deliberations. Thus, under **Wiley**, no error was committed by the trial court which would require reversal.

¶227. I respectfully dissent.

1. Because both defendants, the victim, and a number of witnesses in this case all have the last name "Smith", first names will be used throughout this memo.

2. The victim was not related to the defendants.

3. Clyde Wendell Smith appeals his conviction and sentence separately in case number 93-DP-01470-SCT.

4. The trial court did not allow any testimony concerning the alleged rape.

5. Jerome cites to **Wilcher v. State,** 455 So. 2d 727, 734 (Miss. 1984), *cert. denied*, 470 U.S. 1034 (1985); **Sayles v. State,** 552 So. 2d 1383, 1390 (Miss. 1989); and **Gangl v. State,** 539 So. 2d 132, 135 (Miss. 1989), as supporting authority.

6. Now Uniform Circuit and County Court Rule 9.04.

7. Now Uniform Circuit and County Court Rule 9.05.

8. Neither of these cases support Jerome's argument. **Smith** concerns the introduction of other crimes evidence, and in **Balfour** the prosecutor was in effect "testifying" while questioning a witness who continually plead the Fifth Amendment.

9. In none of the cases cited by Jerome did the Court reverse based merely on the prosecution's vilification of the defendant. Those cases that were reversed were done so on other grounds or because of cumulative errors.

10. **Johns v. State,** 592 So. 2d 86, 90 (Miss. 1991), the only case cited by Jerome in support of this proposition is not on point. In that case this Court held that the conviction of a co-indictee to the same offense charged is not competent evidence on the trial of the other. It did not involve an instance as Jerome

suggests where the jury was told to compare the evidence required for conviction in an unrelated case in order to determine the legal standard required in the case before it.

11. Clyde provides no supporting authority from this State, but instead cites cases from other jurisdictions. In the cases he does cite, the comments made by the prosecutor were far more egregious than in the case at bar. In fact in one of the cases cited, *Tucker v. Kemp,* 762 F.2d 1480 (11th Cir.) *vacated on other grounds* 474 U.S. 1001 (1985), the Eleventh Circuit affirmed even though the prosecutor during a capital sentencing hearing discussed the infrequency of the district attorney's office seeking the death penalty, stated personal opinion concerning the defendant's chance for rehabilitation, and commented that a life sentence would put a burden on the taxpayers.

12. The State utilized a model or drawing of the town of Sidon for witnesses to use to illustrate their testimony.

13. It should be noted that Jerome's co-defendant, Clyde Smith, was given a preliminary hearing, and the transcript from that hearing reveals that trial court continued Jerome's preliminary hearing at the request of his attorneys because of a prior commitment.

14. As an habitual offender, the jury is allowed to know that a life sentence for Clyde Smith would mean life-without-parole. *See Mackbee v. State*, 575 So.2d 16 (Miss. 1990); *Turner v. State*, 573 So.2d 657 (Miss. 1990).